SHERMCO INDUSTRIES, INC., et al., Plaintiffs,

v.

SECRETARY OF THE AIR FORCE, et al., Defendants.

Civ. A. No. CA 3–76–1186–G.

United States District Court,
N.D. Texas,
Dallas Division.

Jan. 26, 1984.

C. Thomas Wesner, Jr., Wesner, Coke & Boyd, Dallas, Tex., for plaintiffs.

Charles D. Cabaniss, Asst. U.S. Atty., Dallas, Tex., for defendants.

## MEMORANDUM ORDER

FISH, District Judge.

*Prior History of the Dispute*

This dispute arises from the efforts of a small business to obtain government contracts for the repair of certain Air Force equipment. Despite its long and complex history, the case falls into four general parts, into which this memorandum is divided.

Part One involves the claims of Shermco Industries, Inc. and Peter Sherman ("Shermco") that (1) the Air Force illegally suspended Shermco, resulting in a denial of contracts, even though the Small Business Administration ("SBA") had previously certified Shermco's responsibility and (2) this suspension denied Shermco its rights under the due process clause and applicable regulations. Part Two overlaps Part One somewhat, but has its primary focus on Shermco's claim that from February 27, 1976 to March 10, 1978, it was de facto suspended from contracts without procedural protections. Part Three addresses whether the Air Force followed its own regulations in deciding not to award Shermco the three contracts in question because it had been determined a "non-responsible" contractor. Part Four concerns what relief, if any, is to be afforded Shermco.

The court's prior order dated November 22, 1976 described the dispute on its arrival here. That description need not be repeated. It is sufficient to state that in the November 22, 1976 order the court held that the Air Force had failed to abide by its own regulations in its June 16, 1976 determination of Shermco's non-responsibility under the Small Business Administration Act ("the Act"), 15 U.S.C. § 631, *et seq.*, as it then existed. The court order directed "[t]hat all parties be returned to their respective status immediately before the Procurement Officer's determination of non-responsibility, and that any *further*

procurement be in strict accordance with the applicable regulations and laws."

*Shermco Industries, Inc., et al. v. Secretary of the Air Force, et al.*, No. CA 3–76–1186–G (November 22, 1976).

As that order made plain, the court's intrusion into the bidding process was confined to that of referee; it did no more than require the Air Force to follow its own rules. Pointedly, the order neither told the Air Force to whom it should award its contracts nor recognized Shermco's entitlement to any government contract. Instead, it ordered only that the government procuring agency follow its own procedures.

The November 1976 order was directed to the Air Force's requests for proposals ("RFPs") numbered 0284 and 0300. The SBA had previously issued certificates of competency ("COC") for Shermco as to both proposals (COC on RFP 0284 issued April 5, 1976; COC on RFP 0300 issued May 5, 1976). Under the terms of the Act, as it was then written, the determination of competency did not include the issue of the contractor's responsibility but was limited to a determination of its capacity and credit. Following the court's November 1976 order, the Air Force vacated its June 1976 determination of non-responsibility and returned RFPs 0284 and 0300 to their prior status.

Shermco did not, however, receive the contracts under those two solicitations. On November 30, 1976, the SBA, with full knowledge of the Air Force's file on Shermco, reaffirmed its earlier COCs on RFPs 0284 and 0300. The Air Force then entered a determination of non-responsibility on December 3, 1976. This second determination of non-responsibility was referred to the SBA pursuant to Armed Services Procurement Regulation ("ASPR") 1–705.4(f), which authorized the SBA to appeal the adverse integrity determination on behalf of Shermco. The SBA did appeal the Air

Force's adverse determination of integrity. That appeal was denied by Brigadier General W.J. Kelly, USAF DCS/Procurement and Production Designee-Head of the Procurement Activity ("HPA"). General Kelly's determination of non-responsibility was based on an FBI report, an on-going criminal investigation by the office of the U.S. Attorney in Dallas, Texas, and a Defense Supply Agency audit of Shermco's procedures pertaining to government-furnished material ("GFM") and contractor-acquired material ("CAM").

After General Kelly's decision of January 11, 1977, solicitations under RFPs 0284 and 0300 were abandoned. The Air Force withheld award of those contracts indefinitely and made arrangements to have the overhaul and repair work done in-house or by issuing new solicitations.

The court concludes that, if the Air Force followed the proper legal procedures, Shermco's claim for relief under RFPs 0284 and 0300 is barred by the Air Force's determination of non-responsibility, as governed by the ASPR and SBA provisions in effect at the time. After discussing the legality of the Air Force's suspension of Shermco, the court will return to this question of procedural regularity and the due process issues.[1]

## PART ONE: EFFECT OF THE AMENDED SMALL BUSINESS ACT ON THE AIR FORCE'S SUSPENSION REGULATIONS

### A. *The Amended Act and ASPRs 1–605 and 1–903*

Shermco responded to Air Force solicitation RFP 0814 which was issued on June 27, 1977. On August 4, 1977, less than two months after the Air Force solicitation for proposal under RFP 0814, the Act was amended. 15 U.S.C. § 637(b)(7) ("the amended Act"). In the amendment, Congress attempted to release the tension between the SBA and government contract-

---

1. Shermco argues that RFPs 0284 and 0300 are governed by the amended Act because it never received notice of their cancellation and because the Air Force did not make its determina-

tions based on current information in the contract file as required by the ASPR. These arguments will be considered below.

ing agencies by ending the division of authority to determine contractor competence. Before the amendment, and as described in this court's November 1976 order, the SBA determined the "capacity and credit" of a contractor while the procuring agency (here, the Air Force through its contracting officer) decided responsibility for reasons other than capacity and credit. The August 1977 amendment appears, at first blush, to have taken the determination of responsibility from the Air Force and given it to the SBA.

Because RFP 0814 was processed after the August 1977 amendment, the amended Act governs the SBA's decision that Shermco was competent and the SBA's decision is, therefore, binding on the Air Force. A wrinkle in the facts presented here, however, prevents this conclusion from completely resolving the dispute over RFP 0814.

On December 16, 1977, a federal grand jury in the Northern District of Texas returned an indictment against Shermco charging it with a violation of Title 18 U.S.C. § 287 (false, fictitious, or fraudulent claims) arising out of the same facts that had given the Air Force concern about Shermco's responsibility. The SBA remained convinced of Shermco's integrity and issued its final COC on January 20, 1978. On February 7, 1978, as a result of the indictment, the Air Force suspended Shermco from doing business with the Air Force specifically and the Department of Defense in general. The merit of Shermco's claim that it was wrongfully denied a contract under RFP 0814 thus turns on resolution of the Air Force's asserted authority to suspend a contractor from all contracts and the SBA's authority under the amended Act to decide conclusively the competence of a small business bidding for a specific government contract. If the Air Force's suspension regulation governs over the amended Act, then Shermco's claim as to RFP 0814 cannot stand.

2. The current procurement regulations are known as Defense Acquisition Regulations or

The Air Force's suspension of Shermco poses, first, the general question of whether a contractor may be suspended from bidding on government contracts after a COC relating to a particular contract has been issued by the SBA and, second, a case specific inquiry into its validity here. The former inquiry turns on the congressional intent behind the August 1977 amendment to the Act, while the latter turns on the procedures actually followed, *i.e.*, whether implementation of the suspension decision denied Shermco due process or violated applicable regulations.

### B. *Suspension and the SBA's COCs*

Shermco argues that the Air Force violated the amended Act by failing to accept the COCs as conclusive and to award the contracts to Shermco. The Air Force responds that the SBA's COC was not conclusive in the face of its suspension proceedings under ASPR 1–605.[2]

Shermco's argument continues that the suspension *regulation* conflicts with the *statutorily* created COC and that the statute must predominate over the regulation. The Air Force replies that the suspension procedure is on a "par" with the amended Act because it was promulgated pursuant to the Armed Services Procurement Act of 1947, 10 U.S.C. §§ 2301–2316. The controlling issue, however, is not whether one measure predominates over the other because it is contained in a statute or whether the two measures are on a "par." The issue is whether Congress, in eliminating the dual determination of the SBA and the procuring agency, intended to eliminate a governmental procurement agency's power to suspend an indicted contractor from participating in government contracts, even in the face of a validly issued COC. This issue will be examined by comparing the language of the amended Act with that of ASPR 1–605 and other procurement regulations, by reviewing the legislative histories of the amended Act and its predecessors, and by considering available case authority construing the amended Act.

"DAR." The section numbers of the DAR correspond to those in the ASPR.

### 1. *Language of the Statute and Regulations*

■ Juxtaposition of the language of the amended Act and that of the procurement regulations indicates that Congress did not intend to give the SBA the power to eliminate a governmental procuring agency's right to suspend a contractor who is under criminal indictment. The amended Act empowers the SBA:

(A) To certify to Government procurement officers, and officers engaged in the sale and disposal of Federal property, *with respect to all elements to responsibility, including,* but not limited to, capability, competency, capacity, credit, *integrity,* perseverance, and tenacity, of any small business concern or group of such concerns to receive and perform a specific Government contract. A Government procurement officer or an officer engaged in the sale and disposal of Federal property may not, for any reason specified in the preceding sentence, preclude any small business concern or group of such concerns from being awarded such contract without referring the matter for a final disposition to the Administration.

\*　　\*　　\*　　\*　　\*　　\*

(C) In any case in which a small business concern or group of such concerns has been certified by the Administration pursuant to (A) ... to be a responsible ... Government contractor as to a *specific Government contract,* the officers of the Government having procurement or property disposal powers are directed to accept such certification as conclusive, and *shall let such Government contract* to such concern or group of concerns *without requiring it to meet any*

*other requirement of responsibility* [emphasis supplied].

15 U.S.C. § 637(b)(7) (1981).

ASPR 1–605.1 provides:

*Causes for Suspension.* The Secretary or his authorized representative (see 1–600(b)) may, in the interest of the Government, suspend a firm or individual:

(i) suspected, upon adequate evidence, of—

(A) *commission of fraud or a criminal offense* as an incident to obtaining, attempting to obtain, or *in the performance of a public contract;*

(B) violation of the Federal antitrust statutes arising out of the submission of bids and proposals; or

(C) commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, receiving stolen property, or any other offense indicating a lack of business *integrity* or business honesty, which seriously and directly affects the question of present *responsibility* as a Government contractor; or

(ii) for other cause of such serious and compelling nature, affecting *responsibility* as a Government contractor, as may be determined by the Secretary of the Department concerned to justify suspension.

Suspension of a firm or individual by the Secretary or his authorized representative shall operate to suspend such firm or individual throughout the Department of Defense [emphasis supplied].

Shermco argues that "suspension" by a government agency cannot override a COC because, when a COC has been issued, the government "shall let such ... contract ... without requiring [the contractor] to meet any other requirement of responsibility ...." 15 U.S.C. § 637(b)(7)(C). The Air Force argues that the amended Act and ASPR 1–605[3] are not in conflict because

---

**3.** ASPR 1–605 provides: "Suspension of a contractor, bidder or offeror is a drastic action which must be based upon adequate evidence rather than mere accusation. In assessing adequate evidence, consideration should be given to

how much credible information is available, its reasonableness in view of surrounding circumstances, corroboration or lack thereof as to important allegations, and inferences which may be drawn from the existence or absence of af-

"suspension" is a broader concept than a "competency determination," in that suspension covers doing business with the Department of Defense generally while the COC relates only to a *specific contract*. To support this position, the Air Force draws a distinction between suspension proceedings under ASPR 1–605 and a determination that a contractor is "not responsible" under ASPR 1–903. The latter regulation empowers a contracting officer to deny a contract to the low bidder if he finds that such a bidder lacks "a satisfactory record of integrity," ASPR 1–903.1(iv). ASPR 1–903 is clearly superseded by the amended Act. *See* note 4, *infra*. Shermco counterargues that, because the amended Act's mandate is broad and does not limit its reference to ASPR 1–903.1(iv), the COC is conclusive "in any case" in which a COC has been issued, and a contract cannot be withheld because of a "responsibility" determination by the government, regardless of the label given to that determination.

A number of grounds distinguish the term "suspension," particularly as that term is used in this case, from the phrase "requirements of responsibility," referred to in the amended Act. These distinctions are demonstrated by comparing the amended Act with both the "responsibility determination" under ASPR 1–903 and "suspension" under ASPR 1–605.[4]

First, the amended Act is *contract specific*, while suspension precludes a contractor from doing *any business* with the government. The amended Act refers to "a specific Government contract" and requires the government to let "such" contract without requiring any other requirement of responsibility. Similarly, ASPR 1–903 responsibility determinations are limited to a single contract. A suspension pursuant to ASPR 1–605, by contrast, precludes a contractor from doing *any business* with the Department of Defense as a whole.

Second, the general references to "integrity" in the amended Act and ASPR 1–903 do not preclude a contracting agency from considering specific conduct by contractors which is damaging to the interests of the government as a whole, and the agency in particular. The amended Act refers to "elements of responsibility" based on factors such as "integrity." ASPR 1–903.1(iv) requires that a contractor have a "satisfactory record of integrity." ASPR 1–605.1(i) authorizes suspension when a contractor is "suspected, upon adequate evidence of—(A) commission of ... a criminal offense ... in the performance of a public contract," *id.* at 1–605.1(i)(A). The latter is a more substantial reason for denying a contractor government business than those denoted by the terms "integrity" and "responsibility" which are undefined in ASPR 1–903 and the amended Act. That is, the 1977 version of ASPR 1–903 authorized a procuring officer to deny a contract for conduct that was not nearly serious enough to support a criminal indictment.[5]

firmative facts. This assessment should include an examination of basic documents, such as contracts, inspection reports, and correspondence. Placing the name of an individual or firm on the consolidated list will be for the purpose of protecting the interest of the Government and not for punishment. Suspension is an administrative determination which may be modified when determined to be in the interest of the Government."

4. The Air Force concedes a fatal inconsistency between the amended Act and the responsibility determination regulation, ASPR 1–903, as both existed in 1979. This inconsistency is evident from the face of both provisions. The authors of the 1979 amendments to the procurement regulations recognized and corrected this inconsistency. A contracting officer can appeal a

COC all the way to the headquarters of the SBA ("HQ SBA") in Washington, but once the COC is approved by HQ SBA, it "shall be considered conclusive and the contracting officer shall award the contract to such concern without requiring the concern to meet any other requirement of responsibility." DAR 1–705.4(f)(ii).

5. This distinction should not be obscured by the fact that another ground for suspension, ASPR 1–605.1(i)(C), uses the words "integrity" and "responsibility." That was not the basis for suspension in this case. Even if it were, that provision defines specific instances of lack of "responsibility" and "integrity" and should prevail over the general undefined terms in the amended Act.

The "catch-all" provision in ASPR 1.605.1(ii) authorized suspension "for other cause of such

## 2. *Legislative History*

The legislative history of the amended Act indicates that Congress did not intend for a COC to override a suspension, particularly one based on an indictment charging a contractor with commission of a criminal offense in performing a government contract.

The most comprehensive legislative discussion of the amendment changing the COC provisions of the Act appears in the House Report.

### TITLE V—CERTIFICATE OF COMPETENCY

Section 8(b)(7) of the Small Business Act authorizes the Small Business Administration to issue a "Certificate of Competency" (COC). This document "certifies to a Federal procuring activity that a small business concern is competent as to capacity and credit to perform *a specific Government contract.* Whenever any question arises as to the capacity and credit of such small business concern, *the Government procurement officer* refers the matter to the Small Business Administration, and its subsequent decision on the matter is conclusive. However, once the COC is issued, the *contracting officer* is merely "authorized" to let *the contract.* There is, at present, no statutory requirement mandating that once a COC is issued the contract must be let to the small business, nor does the statute include other elements aside from a small business's capacity or credit. This has resulted in severe problems for the small business community.

Small business can and has been denied Government contracts because the procuring activity has determined that the small business lacked the requisite "tenacity, perseverance or integrity" to perform *a specific Government con-*

tract. Such a finding results in the small firm being branded as "non-responsible." Resort to the COC procedure in such cases is not available since capacity and credit are, purportedly, not involved. *Although SBA normally has the right to appeal such determinations to a higher authority within the procuring activity, such action is of questionable value as there is an inherent difficulty in asking a bureaucracy to overrule itself.* Also, the procurement need not be held in abeyance pending the appeal if the contracting officer subjectively determines that the items called for by the contract are urgently needed [emphasis supplied].

H.R.Rep. No. 95–1, 95th Cong., 1st Sess. 13, *reprinted in* [1977] U.S.Code Cong. & Ad.News 821, 833.

This report does not discuss the effect of the amendments on the suspension or debarment procedures; rather, it speaks in terms of specific contracts. Although the report does not mention ASPR 1–903(iv) non-responsibility determinations by name, the underlined sentence in the second paragraph strongly indicates that this was the type of determination Congress had in mind when it amended the Act. The underscored portion of the statement shows that the authors of the legislation were concerned about obstructionist tactics on the part of procurement or contracting officers in making responsibility determinations and believed that appeals to "higher authority" from the non-responsibility determinations of these officers had little value.

The "higher authority" within the agency has "original jurisdiction" over the decision to suspend a contractor under ASPR 1–601, *et seq.;* as a result, there is no appeal by the SBA to a higher authority within the agency when a suspension is granted. On the other hand, responsibility determinations under ASPR 1–903(iv) are

serious and compelling nature, affecting *responsibility* as a Government contractor" [emphasis supplied]. Again, this provision was not invoked in this case. Rather, suspension was based on an indictment related to Shermco's

past performance on government contracts. Thus, the court does not reach the question of whether a suspension based on this "catch-all" provision would be valid in the face of a COC.

made by contracting or procurement officers and, until the procurement regulations were amended to reflect the changes wrought by the amended Act, there was a procedure under which the SBA could appeal such determinations. ASPR 1–705.-4(c). These differences indicate that, in amending the Act, Congress was focusing on the problems occurring as a result of ASPR 1–903(iv) non-responsibility determinations, rather than on suspension determinations.[6]

### 3. *Case Law Interpreting the Amended Act*

The decision in *Siller Bros., Inc. v. United States,* 655 F.2d 1039 (Ct.Cl.1981), *cert. denied,* 456 U.S. 925, 102 S.Ct. 1970, 72 L.Ed.2d 440 (1982), which interpreted the COC provision of the amended Act, supports the Air Force's position that the amendment was not intended to take away a procuring agency's power to suspend an indicted contractor. In *Siller,* the Court of Claims held that the Forest Service validly barred a contractor from rebidding on a contract to cut timber in a national forest because the contractor had not cut any timber during the three-year term of a prior contract covering the same timber. In denying the contractor a right to rebid, the Forest Service relied on a regulation prohibiting a contractor from bidding on an uncompleted timber sale contract if that contractor had not completed the contract by cutting the designated timber, 36 C.F.R. § 223.5(h)(1). The contractor contended that application of the rebidding regulation constituted a determination that the bidder was not a responsible bidder. It further argued that under 15 U.S.C. § 637(b)(7)(A), the SBA had exclusive authority to make all determinations concerning the responsibility of small business bidders. The court rejected the contractor's argument holding that, although the language of the amend-

ed Act was broad enough to encompass the Forest Service's application of the rebidding regulation, the legislative history indicated that Congress did not intend the Act to apply to the situation there presented. After reviewing the legislative history, the court concluded:

> Although the 1977 amendments were intended to give the administrator broader authority to determine whether small businesses seeking to participate in government contracts are responsible, we conclude that the provision does not apply to the Forest Service's refusal to permit the plaintiff to bid on the second timber contract. *The purpose of this provision, as reflected in the legislative history of its predecessors, was to end the discrimination against small business that existed because contracting officers had barred those businesses solely because of their smallness and disabilities allegedly resulting from that fact.* There is no indication, however, that Congress also intended to cover the situation of the reletting of the contract after a small business firm had defaulted in performance.

> The Forest Service regulation *does not discriminate against small businesses but generally bars all defaulting contractors from bidding upon the reletting of the contract.* The Forest Supervisor refused to allow the plaintiff to participate in rebidding, not because of alleged deficiencies stemming from its size, but because of its failure to cut any timber under the prior contract. The result would have been the same if the plaintiff had not been a small business. In the special circumstances of this case—where the plaintiff had not cut a single foot of timber under the contract for 3 years—section 637(b)(7)(A) of the

---

**6.** In its post-trial brief, Shermco quotes at length from the opening statement of James C. Corman, Chairman of the House Subcommittee on Government Procurement and International Trade of the Committee on Small Business, during hearings held on June 5, 1975. This statement, and the hearings conducted by Rep. Corman's committee, were primarily concerned

with improper application of the Walsh-Healy Act by procurement officers. *See* 15 U.S.C. § 637(b)(7)(B). The statement adds nothing to the House Report or to the language of the amended Act itself. It discusses obstructionist tactics of procurement officers only in terms of specific contracts.

Small Business Act did not require the Forest Supervisor to refer the matter to the administrator before he could bar the plaintiff from participating in the rebidding of the contract [emphasis supplied].

*Id.* at 1044.

*Siller* is indistinguishable from the present case, even though the contractor's challenge there was based on § 637(b)(7)(A), because no COC had been issued, rather than on § 637(b)(7)(C), the provision at issue here. The Court of Claim's reading of the statute as an anti-discrimination provision of limited application would not have been altered by issuance of a COC.

Neither can *Siller* be distinguished as a case involving a regulation that is not as *responsibility*-oriented as the suspension regulation at issue here. Although the re-bidding regulation in *Siller* did not use the words "integrity" or "responsibility," that regulation did represent a judgment that a contractor who, on the basis of past performance, could not be relied on to perform a contract, should not be allowed a second chance to bid on that contract. If the Court of Claims had been so disposed, it could have found this to be a "responsibility" determination about "perseverance" or "tenacity." Instead, the court found the rebidding regulation to be an even-handed measure that served an important function in the procurement process. In the court's analysis, those judgments that fall within the category of "responsibility" determinations, which are the exclusive province of the SBA, should be confined to a narrow area to permit procuring agencies to retain considerable discretion over their contracts with small businesses.

The suspension regulation in the present case is similar to the rebidding regulation in *Siller*, because it requires a judgment about a contractor's reliability. In this case, the Air Force's finding of unreliability was based on a criminal indictment related to Shermco's performance on other con-tracts. As in *Siller*, the present controversy involves the application of a regulation that does not reflect any intent to discriminate against small business. Rather, the suspension regulation is an even-handed measure whose purpose is to ensure that procurement is conducted in the public interest. If Shermco could not be suspended in the face of a criminal indictment, it would be receiving more than equal treatment because of its small business status.

In conclusion, the language of the amended Act, its legislative history and the legislative history of its predecessors, the available authority interpreting it, and a comparison of the government procurement regulations on responsibility determinations and suspension all coalesce to indicate that, in amending the SBA's COC provision, Congress did not eliminate a procuring agency's power to suspend a contractor who is under a criminal indictment related to past performance on government contracts. A contrary result would weaken the suspension process, making it impossible for an agency to protect the procurement process while it or other authorities are investigating criminal conduct by contractors.

### C. *The Legality of the February 7, 1978 Suspension*

Shermco argues that its suspension by the Air Force from February 7, 1978 to March 10, 1978 was not conducted in compliance with applicable regulations and denied it due process.

#### 1. *Due Process*

■ Shermco had a protected liberty interest that was affected by its suspension by the Air Force for fraud and dishonesty.[7] *See Transco Security, Inc. v. Freeman,* 639 F.2d 318, 321 (6th Cir.), *cert. denied,* 454 U.S. 820, 102 S.Ct. 101, 70 L.Ed.2d 90 (1981). In order to determine what process was due Shermco, a balance must be struck between the government's interests in suspending Shermco and Shermco's liberty in-

---

7. It has been held that the deprivation of the right to bid on government contracts does not impinge a property interest because procurement statutes are for the benefit of the government, not bidders. *See Transco,* above, at 321.

terest in having an opportunity to bid on and receive government contracts, free from a cloud of fraud. The government had two interests at stake in suspending Shermco: its interest in purchasing services essential to its daily operations, *i.e.*, the importance of having a responsible contractor repair airborne electrical equipment, and its interest in protecting the integrity of a criminal prosecution. *See Transco*, above, at 322. The second interest is stronger in the present case than it was in *Transco* because the indictment in this case was issued prior to Shermco's suspension.

■ In deciding what process was due Shermco, it must be remembered that due process consists of (1) notice and (2) an opportunity for hearing appropriate to the nature of the case. *Id.*, at 321.

### a. *Notice*

Whether notice given a suspended contractor is sufficient depends on several considerations. The first is whether timing of the notice allowed meaningful opportunity to rebut the charges. Two recent Court of Appeals decisions seem to impose different due process requirements for the timing of notice of a suspension. In *Transco*, above, at 320, 323, the contractor received no notice until *after* the suspension. Although the Sixth Circuit discussed whether the notice there involved was constitutionally infirm due to vagueness and the inconsistent explanations given by the agency for its decision to suspend, the court gave no indication that notice, to be constitutionally sufficient, had to be given before suspension.

On the other hand, in *Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953 (D.C.Cir.1980), the D.C. Circuit held that a contractor was denied due process when it was not told, *before* two non-responsibility determinations, that it was under investigation and, after the determinations, was told only that they were based on the lack of a "satisfactory record of integrity." The court held that a subsequent suspension proceeding, even if it fully complied with due process, could

not overcome the constitutional deficiency caused by the failure to give notice. *Id.*, at 967. In *Old Dominion*, the government gave no notice before suspending the contractor. Thus, the court found it unnecessary to address the situation presented here, *i.e.*, "the situation in which the contractor had in fact received constructive notice of the *actual charges* against him before communication of an agency determination that the contractor lacked integrity" [emphasis in original]. *Id.*, at 961 n. 15.

ASPR 1–605, as applicable to this case, does not expressly require notice before suspension. In fact, the Air Force concedes that it did not give Shermco formal notice that suspension was being considered until it was actually suspended. Rather, the Air Force claims that notice was constitutionally sufficient when Shermco received "constructive notice" that its responsibility was under challenge, and that this notice adequately afforded Shermco the opportunity to rebut this challenge to its responsibility. *Old Dominion* suggests that minimum due process standards are satisfied if such "constructive notice" informs the contractor of the actual charges against him in time for meaningful preparation for a hearing or its equivalent—a result consistent with *Transco's* emphasis on the informative value of the notice, rather than its form.

■ Under the circumstances of this case, the constructive notice provided to Shermco, by way of a draft of the proposed indictment against it, was constitutionally sufficient. This draft indictment was delivered to Shermco several months before the suspension proceedings were instituted; it sufficiently informed Shermco of the existence of an investigation and the substance of the charges against it.

Shermco argues, however, that the indictment was not sufficiently specific notice, citing the Suspension Board's comment that the indictments appear vague and the evidence incomplete and its determination that adequate evidence was not

available. In light of these reservations about the indictment, the Suspension Board did meet a second time before recommending suspension and reviewed some "additional information," including copies of statements and other material supporting the indictment.

Shermco's argument, however, misses the mark. The level of specificity that the Suspension Board may require to recommend suspension is not necessarily equivalent to that required for constitutionally sufficient notice. The suspension regulation provides that the notice is to describe the irregularities on which the suspension is based "in general terms, without disclosing the Government's evidence." ASPR 1–605.3. The Sixth Circuit held in *Transco* that notice is constitutionally sufficient if it affords an opportunity to prepare plaintiff's in a meaningful way for a forthcoming hearing or its equivalent. 639 F.2d at 323. Because the indictment here named specific contracts and made specific charges related to those contracts, it met the specificity standards of *Old Dominion* and *Transco*. Accordingly, the notice to Shermco was constitutionally sufficient.

### b. A "Hearing"

■ *Horne Brothers, Inc. v. Laird*, 463 F.2d 1268 (D.C.Cir.1972), decided that the district court erred in enjoining performance of a government contract on which plaintiff had bid. The appellate court vacated the injunction because only three weeks elapsed between suspension and issuance of the injunction, so that the government had not had a reasonable time to determine what kind of hearing or rebuttal opportunity to give the suspended plaintiff. In that situation, the court concluded the government should ordinarily have a month to determine what sort of rebuttal opportunity to give the contractor, unless such a rebuttal procedure would jeopardize national security or "prejudice a prosecuto-

rial action against the contractor." *Id.*, at 1278. The court declined to discuss the rights of a suspended contractor in the usual post-indictment situation.

Similarly, the court in *Old Dominion* declined to address the "hearing" requirements for suspended contractors or the impact of an indictment on a contractor's hearing rights, 631 F.2d at 968, but it did refer to the one month "grace period" it had previously approved in *Horne Brothers*. 631 F.2d at 966.

In *Transco*, the Sixth Circuit held that, where a contractor was under criminal investigation, an opportunity for rebuttal constituted a sufficient due process "hearing." 639 F.2d at 322.

ASPR 1–605 was amended after recognition of the one-month grace period in *Horne Brothers*. The regulation now expressly provides for post-suspension submission of rebuttal information if a contractor is under criminal indictment or if the Justice Department determines that holding a pre-suspension hearing would jeopardize an on-going civil or criminal prosecution. ASPR 1–605.2(a)(2), b(1). The contractor is entitled to a pre-suspension hearing, however, only if there is no indictment, no objection from the Justice Department, and no possibility of a civil or criminal prosecution against the contractor. *Id.*

Shermco was indicted before suspension proceedings were initiated. Under the regulations, and consistent with the decisions in *Horne Brothers* and *Transco*, Shermco had an opportunity to submit rebuttal information, particularly in light of the indictment. The regulations, in ASPR 1–605.2, spell out this right of rebuttal, though the right is not mentioned in the order suspending Shermco.[8] Even if the court assumes that failure to note this rebuttal right in the suspension order was

8. The record does not indicate whether Shermco was aware of this right or attempted to avail itself of an opportunity for rebuttal. The Air Force claims that, before suspension was initiated, Shermco submitted rebuttal information to General Kelly. Shermco answers that this information was merely a history of Shermco but was in no sense an effort to respond to the specific charges against it. Shermco's view of the earlier "rebuttal" appears to be more accurate.

constitutionally deficient, Shermco's right to a hearing was not violated because the suspension was terminated after 31 days, i.e., within the "grace period" sanctioned by *Horne Brothers* and *Old Dominion*. In sum, Shermco's due process rights to notice and hearing were not violated by the February 7, 1978 suspension.

### 2. Compliance of the Suspension with Procurement Regulations

■ As discussed above, the Air Force's February 7, 1978 suspension of Shermco complied with the notice and hearing requirements of the suspension regulations.[9] It also met the additional requirement that the suspension be based on "adequate evidence," ASPR 1–605, because the Suspension Board gave careful consideration to the criminal indictment against Shermco and "additional information" supporting that indictment before it recommended suspension.[10] *See Horne Brothers*, above, at 1271.

### PART TWO: DE FACTO SUSPENSION

■ Shermco has alleged that from February 27, 1976 to March 10, 1978, it was de facto suspended from receiving government contracts. Shermco was not indicted until December 16, 1977. Formal suspension proceedings against Shermco commenced on December 28, 1977 and were concluded with a suspension order on February 7, 1978. Thus, Shermco claims that it was excluded from receiving government contracts for over 21 months before it was indicted, 22 months before the Air Force commenced formal suspension proceedings against it, and for over 23 months before it was formally suspended. Suspension is a drastic action because it bars a contractor from doing business with any agency in the Department of Defense. ASPR 1–605.1. In light of the severe economic conse-

quences of suspension, whether its exercise is proper depends on procedural protections afforded the contractor. *See Old Dominion*, above, at 963–64, 966–69; *Horne Brothers*, above, at 1271. These protections have been held to include the requirements that the contractor receive notice and a hearing or opportunity for rebuttal, that the suspension be based on adequate evidence, and that the suspension be terminated after a specified period. Shermco argues that the Air Force intended to avoid affording it these procedural protections by de facto suspending it from all government contracts.

### A. De Facto Suspension Cases

The doctrine that procedural protections must be given to a contractor facing any kind of "suspension" was announced in *Horne Brothers*, above, at 1271:

> [A]n action that "suspends" a contractor and contemplates that he may dangle in suspension for a period of one year or more, is such as to require the Government to insure fundamental fairness to the contractor whose economic life may depend on his ability to bid government contracts.

*See also Myers & Myers, Inc. v. United States Postal Service*, 527 F.2d 1252, 1259 (2d Cir.1975).

■ A procuring body cannot hold a contractor in "suspended animation" for an indefinite period of time without affording it the protections which are associated with a formal suspension or debarment. *Art-Metal—USA, Inc. v. Solomon*, 473 F.Supp. 1, 5 (D.D.C.1978). The contractor is entitled to receive these protections even though the procuring body did not label its action a "suspension." *Myers & Myers*, above, at 1259; *Art-Metal*, above, at 5 and

---

9. The regulations do not require an express statement in the suspension order informing the contractor of a right to submit rebuttal information.

10. The indictment was dismissed in March 1978, but there are several factors indicating that the suspension was based on adequate evidence, notwithstanding the dismissal. First, the Suspension Board considered "additional evi-

dence" before making its decision. Second, the indictment was dismissed, at least in part, not for lack of evidence that Shermco had improperly handled GFM and CAM but because personnel in the office of local contract administration (DCASR Dallas) were aware of Shermco's questionable handling of this property and had not taken action against Shermco.

n. 6. De facto suspension may be shown by the successive denial of a number of contracts on which the contractor is low bidder, *see Art-Metal*, above, at 5, and *Old Dominion*, above, at 961 n. 17, though the contractor's other actions and statements may also support its existence. *See Art-Metal*, above, at 5–6; *Peter Kiewit Sons' Co. v. U.S. Army Corps of Engineers*, 534 F.Supp. 1139, 1146 (D.D.C.1982), *rev'd on other grounds*, 714 F.2d 163 (D.C.Cir.1983).

## B. *The De Facto Suspension of Shermco*

Fixing the time at which a de facto suspension begins is difficult. It requires an inquiry into the actions and words of officials of the procuring agency. The post-trial brief submitted by the Air Force seems to concede that its decision not to award contracts to Shermco was made at some point during the period in question:

> Defendants do not deny that one or more of the Air Force solicitations referred to by plaintiffs ... were delayed; nor do defendants deny that Plaintiff Shermco was excluded from receiving Air Force contracts under these RFPs during the period February 27, 1976 to March 10, 1978.

Defendants' Post-Trial Brief at 22.

The following discussion will summarize the evidence from which the date of that decision may be deduced. RFPs 0284 and 0300 were originally issued on November 4, 1975 and January 28, 1976, respectively. Stipulation No. 2. Pre-award surveys on RFPs 0284 and 0300 were conducted on Shermco between January 22, 1976 and March 18, 1976. These surveys were negative. One of the reasons stated for the negative surveys was Shermco's Property Control (Government Property). Stipulation No. 3.

On February 27, 1976, the contracting officer, Ralph Munch, deferred making a responsibility determination to Mr. Lackey at Sacramento Air Logistics Command ("SALC"). Stipulation No. 5. Shermco has chosen this date as the beginning point of its de facto suspension. The court, how-ever, cannot agree that the suspension began at that time. At that point, the Air Force had taken no other action tending to support Shermco's claim that the Air Force had decided to deny Shermco this contract and all other contracts while it was being investigated. In fact, the Air Force followed proper procedure by referring this matter to the SBA on March 30, 1976. *Id.*

On April 5, 1976, the SBA determined Shermco had capacity and credit to perform RFP 0284 and issued a COC. Stipulation No. 15. On April 7, 1976, Munch received additional information from the FBI about Shermco's property control system, Stipulation No. 16, and the next day he referred RFP 0300 to the SBA for a determination of capacity and credit. Meetings were held between the SBA, Munch and Lawrence Weintrob, the Defense Supply Agency auditor, about Shermco's property control system. Stipulation No. 19.

Despite those meetings, the SBA awarded Shermco a COC for RFP 0300 on May 5, 1976. Stipulation No. 14. On May 11, 1976, Munch told a price analyst at SALC who was working on these solicitations to stop work, though Munch had no express authority under the regulations to issue such an order. Stipulation No. 24. On May 17, 1976, Munch examined the FBI Report on Shermco, Stipulation No. 27, and on June 16, 1976, he ordered that Shermco not be awarded the contracts on the ground that it was not a responsible contractor. Stipulation No. 32.

A finding of de facto suspension is not justified at the time of the first determination(s) of non-responsibility unless there is evidence that the procuring body had decided that from that point forward it would award no further contracts. *See Art-Metal*, above, at 5. There is no evidence that the Air Force had, at that point, decided to deny Shermco all future contracts. Munch's instructions to the price analyst to delay action on the solicitations appears to be based on Munch's need for additional information to make responsibility determinations rather than on any plan to suspend Shermco.

During this same period, the Air Force was reviewing a five year contract it had with Shermco, No. F04606–75–D0060 ("0060").[11] On June 25, 1976, Munch terminated this contract on the ground that Shermco had failed to meet quality standards. Tr. 302. Shermco contends that the termination was not for quality reasons but instead was part of a plan to deny it contracts, without the protections required for a formal suspension. In support of this contention, Shermco urges that the Air Force ignored improvements in its quality procedures which were documented in a study by the Air Force Contract Administration Office in Dallas. Tr. 295–96. Munch's testimony indicates the Air Force was looking for a way to get out of the contract. Tr. 289–95, *see* PX 15.

Although the timing of this termination was "convenient" and could support an inference that the Air Force was formulating a plan to avoid all business with Shermco, there is also evidence that the Air Force had experienced a history of quality problems with this contract. Thus, it appears that the Air Force had a legal right to terminate the contract and a legitimate reason for its termination. Shermco received its procedural due in its unsuccessful appeal to the General Accounting Office ("GAO"). It follows that June 25, 1976, is not the beginning of a de facto suspension.

On November 22, 1976, this court overturned Munch's June 16, 1976 non-responsibility determinations because he had not provided the SBA with a copy of the FBI Report on which his determinations were based. On December 3, 1976, Munch determined for a second time that Shermco was not responsible to perform 0284 and 0300 because it lacked integrity; he then forwarded the FBI Report to the SBA along with his determination. Supplemental Stipulation No. 1, Ex. 1, pp. 2–4.

On December 14, 1976, the SBA reaffirmed its view that Shermco was responsible, Supplemental Stipulation No. 1, Ex. 1, p. 8, but the Air Force denied the SBA appeal on January 11, 1977.

While the Air Force used an authorized procedure (the non-responsibility determination) to handle these solicitations, the question still remains whether it was obligated at that point to initiate suspension proceedings. Given the then existing nature of non-responsibility determinations and the circumstances surrounding these particular determinations, the court concludes that it was not so obligated.

In January 1977, the procuring agency still had ultimate authority over the integrity aspect of responsibility determinations. It is understandable that a procuring agency would not think it necessary or appropriate to initiate a suspension procedure to handle integrity-related problems when the less "drastic" option of a non-responsibility determination was available. It might be argued that the Air Force had, at that point, already made non-responsibility determinations based on Shermco's lack of integrity and that it was therefore obligated to initiate suspension rather than make successive non-responsibility determinations. In re S. Kane & Son, Inc., 43 Comp. Gen. 140, 141 (1963). The determinations in January, 1977 were not, however, "successive," because they involved the same work which had been the subject of the adverse determinations in June 1976, and these earlier determinations would have been final six months earlier if Munch had complied with certain procedural requirements. *Kane*, by contrast, involved a number of determinations on different projects.

During 1977, the Air Force actually de facto suspended Shermco. Shermco responded to the solicitation for RFP 0814 with the lowest bid on June 27, 1977. On August 4, 1977, the Act was amended to give the SBA final authority over integrity-related responsibility determinations. On September 12, 1977, Munch ordered that

---

11. The Air Force connects RFPs 0284 and 0300 to 0060. It refers to these solicitations as "follow-on contracts" to 0060. Defendants' Post-Trial Brief at 8. Shermco, however, asserts that RFPs 0284 and 0300 were not solicitations for the follow-on contract to 0060. Plaintiffs' Response to Defendants' Post-Trial Brief at 8.

Shermco not be awarded a contract on RFP 0814 because it was not responsible for integrity reasons. Munch then referred the matter to the SBA's Regional Office. The Regional Office's decision to issue a COC was appealed by the Air Force to the SBA. Headquarters in Washington. The Air Force lost that appeal and a COC was issued on January 20, 1978. During this process, a Dallas grand jury returned an indictment against Shermco (December 16, 1977), and, at that point, the Air Force formally initiated suspension proceedings (December 28, 1977). On February 7, 1978, Shermco was formally suspended.

Although the Air Force was entitled to invoke suspension procedures, even in the face of the valid COC, and although the requirements of due process were observed when formal suspension was finally invoked, this does not mean the Air Force was free to delay the initiation of suspension. The de facto suspension cases hold that a procuring body cannot leave a contractor "dangling" while it decides whether to initiate suspension procedures. *Art-Metal*, above, at 5. In this case, the Air Force allowed Shermco to "dangle." The evidence indicates that the Air Force had been playing a "waiting game" for several months prior to soliciting bids on RFP 0814, as evidenced by a Supplemental Stipulation made by the parties on May 19, 1977.

> [Munch] believes that the AF [Air Force] would initiate debarment proceedings *if Shermco were indicted* for theft of government property [emphasis supplied].

Supplemental Stipulation No. 17.

The Air Force delayed the award of the contract on RFP 0814 to Shermco by going through the process of a non-responsibility determination and appeal. It did so because it did not want to initiate suspension proceedings until Shermco was indicted for criminal fraud. The fact that the Air Force

had determined that it would not award this contract or any other contract to Shermco while the criminal investigation was pending is also evidenced by its decision on November 28, 1977 to hold another solicitation, RFP 0595, in "abeyance." [12] Plaintiff's Exhibit 141. Once the indictment was returned, the Air Force finally initiated suspension.

Shermco was injured by the Air Force's failure to institute formal suspension proceedings, most importantly by loss of the time limits which are part of the formal suspension process. The maximum period of suspension is normally 12 months, with a possible extension of up to 6 months upon the express request of the Justice Department. ASPR 1–605.2(c). If the Dallas grand jury had not indicted Shermco, the Air Force might have continued indefinitely issuing non-responsibility determinations or holding solicitations in "abeyance." An investigation of a contractor could extend indefinitely if the time limits of the suspension regulations were not enforced.

Aside from losing the benefit of time limitations, Shermco also lost its right to have a determination that "adequate evidence" existed to justify denying it government contracts. ASPR 1–605. Although Shermco did receive constructive notice of the charges against it *after* the non-responsibility determination (a draft copy of the grand jury indictment) and had a limited rebuttal opportunity in connection with the appeal of that determination (it submitted some information to the SBA), it did not receive the more extensive "hearing" that is usually associated with suspension. *See* 1–605.2.

 Under these circumstances, the Air Force was not justified in resorting again to the responsibility determination process. It had already made responsibility determi-

---

**12.** This solicitation was first issued on June 29, 1977 but was delayed by the normal operation of the procurement process until November 28, 1977. At that point, the Air Force took the unauthorized action of holding the solicitation

in "abeyance." Shermco has not included this solicitation in its prayer for relief because the SBA subsequently decided not to issue a COC on this contract.

nations on the same grounds[13] on RFPs 0284 and 0300, prior to its determination on RFP 0814. A procuring agency cannot make successive determinations of non-responsibility on the same basis; rather, it must initiate suspension or debarment procedures at the earliest practicable date following the first determination of non-responsibility.

None of the arguments raised by the Air Force persuade the court that the delay in suspending Shermco was justified.[14] Requiring the Air Force to initiate suspension promptly does not, as argued by the defendants, destroy the integrity of the procurement process by requiring it to contract with the "Mafia." Defendants' Post-Trial Brief at 22. Nor does it require the procuring agency to second-guess a prosecutor or a grand jury. Rather, it requires only that the procuring agency provide a contractor certain minimal protections before deciding not to award any contracts to a bidder under criminal investigation.

■ The Air Force did not initiate suspension until 6 months after Shermco was determined to be low bidder on RFP 0814 and 3½ months after Munch made his non-responsibility determinations. Suspension was not ordered until 7½ months after the bid and almost 5 months after the non-responsibility determination. This period of delay far exceeds the "temporary suspension" grace period of one month for exigent circumstances during which the contractor is without the procedural protections provided in the suspension regulations. *See Old Dominion*, above, at 966; *Horne Brothers*, above, at 1270. The Air Force's initiation of formal proceedings to suspend Shermco on December 28, 1978 was too little and too late to protect Shermco's rights.

In *Old Dominion*, the D.C. Circuit pointed out that once a contractor has been injured by the procuring agency's delay, then no amount of process can completely redress its injury:[15]

It is plain that <u>Horne Brothers</u> and <u>Gonzalez</u> [*Gonzalez v. Freeman*, 334 F.2d 570 (D.C.Cir.1964)] do not validate the Government conduct in this case. First of all, both of those cases dealt with <u>formal</u> Government action, and allowed a short period of delay for the imposition of procedures <u>otherwise required.</u> In <u>Horne Brothers</u>, the contractor had been formally suspended; in <u>Gonzalez,</u> the contractor had been formally debarred. In the present case <u>no comparable decisive Government action</u> was taken, although contracts were denied. <u>Such denials</u> [non-responsibility determinations] <u>could have continued indefinitely with absolutely no recourse for the contractor. In such a case, the Government cannot invoke suspension procedures after-the-fact and claim that those procedures are adequate.</u> The injury complained of in this case is the loss of contracts before Old Dominion [the contractor] was ever suspended, <u>not</u> the loss of contracts after suspension but before suspension procedures were able to be implemented [single underlining denotes emphasis in original, double underlining denotes emphasis supplied].

631 F.2d at 966–67.

Here, the Air Force's failure to take "decisive action" injured Shermco, at least in-

---

**13.** The Air Force might argue that the second determinations on RFPs 0284 and 0300 were not made on the same basis as the first because Munch considered an updated audit report from the Defense Supply Agency in making them. This audit did not, however, add to the FBI Report, except that it contained more examples to justify the allegation that Shermco had stolen government property and made false claims against the government. The two sets of determinations were made on the same basis because they concerned the same allegations.

**14.** The Air Force relies on its right to terminate contracts with Shermco as justifying its actions. This argument goes only to its decision to terminate the 0060 contract, however, and is not a general defense to the charge that it de facto suspended *Shermco* by its actions in relation to the solicitations in question. *See Old Dominion*, above, at 966–67; *Art-Metal*, above, at 6.

**15.** *Old Dominion* was not decided on a de facto suspension theory but is nevertheless quite similar to the present case.

sofar as RFP 0814 is concerned. Appropriate relief for this injury will be discussed in Part Four, below.

PART THREE: WERE AIR FORCE DETERMINATIONS OF NON–RESPONSIBILITY ON RFPS 0284, 0300 AND 0814 IN COMPLIANCE WITH APPLICABLE REGULATIONS?

In its order of November 22, 1976, this court ordered the Air Force to cancel the non-responsibility determinations on RFPs 0284 and 0300 and to return those RFPs to their previous status because, in making the non-responsibility determinations, the Air Force failed to comply with its own regulations. Shermco claims that when the Air Force reissued non-responsibility determinations on RFPs 0284, 0300 and 0814, it once again failed to comply with applicable regulations.

### A. *Propriety of Approval*

Shermco claims that Munch did not obtain proper approval of his non-responsibility determinations. In relation to RFPs 0284 and 0300, Munch's decision was approved by General Kelly rather than by the HPA, Col. Grubaugh, or his designee, as required by ASPR 1–705.4(c)(vi). This delegation was proper, however, under another regulation, ASPR Supplement 1–453.50; Tr. 405–07.

Shermco also claims the determination on RFP 0814 was defective because no one besides Munch ever approved it. The Act was amended before Munch's determination on 0814, however, and Munch immediately referred his determination to the SBA in conformity with the amended statute. Although immediate referral to the SBA was not formally incorporated into the regulations until 1979, in light of the amended Act's provision that COCs shall be conclusive on all aspects of contractor responsibility, Munch's referral served to expedite SBA consideration of his non-responsibility determination. Tr. 406.

### B. *Non-Current Delivery of Files*

Shermco argues that Munch violated ASPR 1–705.4(c)(vi) by sending the file on RFPs 0284 and 0300 to General Kelly 31 days after delivery of the file to the SBA, but it has not shown that this violation prejudiced its substantial rights. Non-current delivery did not delay consideration of Shermco's appeal because General Kelly entered a decision approving the determinations eight days after he received the file.

### C. *Incomplete Referral to the SBA*

#### 1. *RFPs 0284 and 0300*

 Shermco claims that the Air Force failed to make a complete referral of the information on which it made its decision, in violation of ASPR 1–705.4(c)(vi). The referral to the SBA on RFPs 0284 and 0300 substantially complied with the regulations. Although Munch did not include copies of the solicitations and certain background documents so that technically the SBA did not have every document to which it was entitled under the regulations, it did have the essential document it needed to review Munch's determinations—the FBI Report.[16] This type of "error" is not sufficiently material to overturn Munch's decision. The SBA had previously issued COCs for these solicitations and was therefore aware of the background of these RFPs.

#### 2. *RFP 0814*

 Shermco's claim that Munch made an incomplete referral of the file on RFP 0814 is more substantial. Before his determination on 0814, Munch reviewed (1) the FBI report, which had been completed before his determinations on RFPs 0284 and 0300, Plaintiffs' Exhibit 102; (2) a second FBI investigation; and (3) a 1977 audit performed at the FBI's request by Lawrence Weintrob of the Defense Supply Agency.

---

**16.** The SBA never received a portion of an informal memorandum that was written by Weintrob in preparation of his 1976 audit of Shermco. *Compare* Plaintiffs' Exhibits 163 and 174. The excised portion of the memorandum, *i.e.,* item 10, concerned the local contract administration office's (DCASR Dallas) handling of certain fraudulent property claims. Compared to the total report, this portion of a single memorandum is inconsequential.

The SBA had a copy of the original FBI report.[17] The second FBI investigation concerned alleged "indiscretions" of an Air Force officer, Colonel Bruno, in his dealings with Shermco. Since Munch's determination was based on charges that Shermco had filed fraudulent claims against the government, Tr. 318–21, his failure to include the report of an unrelated second FBI investigation was harmless.

As far as the 1977 Weintrob audit is concerned, it should be noted that Munch knew of pending criminal charges against Shermco when he decided not to deliver the audit to the SBA, and his actions should be evaluated in light of that knowledge. In October 1977, the U.S. Attorney, Ken Mighell, was considering whether to go to the grand jury with the original FBI report and the 1977 audit. In November 1977, Mighell took the case to the grand jury, which returned the indictment on December 16, 1977.

On October 6, 1977, Munch conversed by telephone with Mr. Pope of the SBA Dallas Regional Office; during that conversation, Pope informed Munch of the existence of the 1977 Weintrob audit. Later in October, Munch sent the SBA a letter informing it, in summary fashion, of the substance of the proposed indictment against Shermco. Plaintiffs' Exhibit 86. Munch testified that he felt "hamstrung" by the current criminal investigation and thus could not release the entire 1977 audit.

> [The 1977 audit was] information that I couldn't release just as [was] the initial situation with the [original] F.B.I. report. You know, [the U.S.] attorney's office wouldn't allow the release of it ... I was aware of [this Court's November 22, 1976] order and I guess I assumed that the SBA had everything they needed ... I knew there was *something* that went from the U.S. Attorney's office to the SBA [emphasis supplied].

Munch deposition at 103–05.

The "something" that the U.S. Attorney sent the SBA was a copy of the draft indictment and a "summary" of the 1977 Weintrob audit. Shermco also received a copy of the draft indictment. Shermco argues that this "summary" of the Weintrob audit was inadequate because it was not a complete referral. The "summary" consisted of the first eleven pages of the audit, excluding the footnotes which referred to supporting documents and the supporting documents themselves.

Shermco maintains that the Air Force has repeated the same mistake that caused this court in its November 22, 1976 order to overturn the Air Force's original non-responsibility determinations on RFPs 0284 and 0300. In that order, this court commented on the referral requirement:

> [T]he requirements that evidence be substantial, in the file, and *transmitted to the S.B.A.*, are not "technical" violations but central to the integrity of the procurement process. If a procuring agency can determine non-responsibility without such demonstration and accountability to the S.B.A., the will of Congress that the S.B.A. make the decision as to capacity is easily frustrated. Moreover, the consequence of a determination that a firm lacks "integrity" and that it lacks capacity to perform may be quite different. The procurement officer's determination of non-responsibility pins a lasting and infamous badge upon the company. Given the consequence of such a determination the specter of that decision being made *in reliance upon a secret government report, available to no one with any incentive to correct any error of judgment by a contracting officer choosing to rely upon it*, is frightening [emphasis supplied].

*Shermco Industries*, above, slip op. at 9.

Contrary to Shermco's arguments, several factors distinguish the referral made to the SBA on the RFP 0814 determination from those made concerning the original determinations on RFPs 0284 and 0300.

---

**17.** The SBA had a copy of this first FBI Report in its Washington office which it had reviewed in connection with RFPs 0284 and 0300. It waived its right under the regulations to receive a copy of the FBI Report at its regional office in order to expedite appeal of the determination.

First, although the 1977 audit itself was not given to the SBA, a "summary" detailing the specific instances in which Shermco had allegedly filed false claims was forwarded to the SBA. In the case of the original determinations on RFPs 0284 and 0300, the SBA did not receive any specific information about the contents of the FBI Report. Second, Shermco itself received a copy of the draft indictment. Clearly, Shermco was "one with [an] incentive to correct any error of judgment by a contracting officer choosing to rely upon [this report]," *id.* With the specific information contained in the draft indictment, Shermco had the ability to prepare a rebuttal to these charges, as it did before the SBA decided to issue a COC. Finally, Munch was confronted with the "specter" of an impending criminal prosecution. Such a "specter" was not present at the time of his original non-responsibility determinations on RFPs 0284 and 0300. Although the referral requirement is not simply a "technical" one, Munch's treatment of the referral, in light of these factors, does not justify overturning his determination.

### D. *Specification of Deficiencies*

■ In its appeal of a non-responsibility determination, the SBA is supposed to include statements about how a contractor's "deficiencies" can be corrected. Shermco argues that, under ASPR 1–705.4(c)(vi), a contracting officer is implicitly required to make specific findings of fact in any non-responsibility determinations but that Munch failed to do so in the determinations at issue here.

Assuming *arguendo* that this requirement exists, Munch satisfied it. He adequately informed the SBA of the reasons for his determinations on RFPs 0248 and 0300 by giving it a copy of the FBI report on which he based the determination. The SBA was also adequately informed of the reasons for Munch's determination on RFP 0814 because it had a copy of the FBI report at its headquarters in Washington.

Moreover, it received a copy of the proposed indictment against Shermco and a "summary" of Weintrob's 1977 audit.[18]

### E. *Confidentiality Limitations on SBA Appeal*

Shermco argues that the confidentiality limitations on the FBI report made it impossible for the SBA to conduct an effective appeal because it could not obtain information from Shermco to refute the charges against the contractor. Shermco suggests that the Air Force conspired with the FBI to impose these confidentiality requirements. Plaintiffs' Post-Trial Brief at 74–78.

The evidence does not indicate such a conspiracy, and the Air Force was not in a position to change these confidentiality requirements. The fact that a pending criminal investigation was pending, which eventually resulted in an indictment, indicates these confidentiality requirements were justified.

### F. *Maintenance of Files and Supporting Information Not in Munch's "Possession"*

Shermco claims that Munch failed to maintain the information supporting his non-responsibility determinations in "the contract file," and did not "have in his possession or obtain" the evidence on which he based his determinations before making them, in violation of ASPR 1.904.1, Plaintiffs' Post-Trial Brief at 55, and 1.905.-1, Plaintiffs' Post-Trial Brief at 40, respectively.

#### 1. *RFPs 0284 and 0300*

■ Munch kept a single copy of the original FBI report, which was placed in the SBA referral folder in a cabinet in the area of Munch's office, but he kept separate files in the bid opening room that did not contain copies of the report. Plaintiffs' Post-Trial Brief at 57–58. Munch's failure to make additional copies of the report and to place them in what Shermco characterizes as "the contract files" is not contrary to

---

**18.** Whether this "summary" violated the regulations requiring a complete referral to the SBA is discussed in relation to that topic.

the purpose of the regulation. That purpose is to enable the SBA to review the contract officer's decision. Because a copy was placed in the SBA file, the regulation's purpose was satisfied. Munch's treatment of the document was consistent with the confidentiality that should have been accorded an FBI report.

Shermco also contends that Munch violated the procurement regulations because he did not have the FBI report in his "possession" prior to making his determinations on RFPs 0284 and 0300. This allegation is unfounded because Munch obtained a copy of the report on December 2, 1976 and made his determination on December 3, 1976. Plaintiffs' Post-Trial Brief at 42–43. Shermco claims that Munch did not comply with the "possession" regulation because he had already made his "decision" before picking up the report, even if he had not formally entered his determination, but the record does not support this assertion.

### 2. RFP 0814

■ Munch had all of the documents supporting his decision in *a* file in his office area at the time he entered the determination. For the reasons outlined in connection with RFPs 0284 and 0300, Munch substantially complied with the regulation even though he did not make separate copies of these documents for each of "the contract files."

■ Shermco argues that Munch also violated the regulations because he did not include a copy of the report of the FBI investigation of Colonel Bruno's dealings with Shermco in his files and never took it into his "possession," but merely reviewed it at the Security Police office. Plaintiffs' Exhibit 70. Because Munch did not base his determinations on this report, however, he was not obligated to take it into his possession or to copy it for his files.

### G. *Adequacy of Evidence for the Determination*

Shermco has advanced a number of claims concerning the adequacy of Munch's information in making the responsibility determinations. In particular, Shermco

claims that Munch failed to seek diverse sources of information, as required by ASPR 1–905.3, did not make "maximum practicable use of currently valid information on file or within the knowledge of personnel in the Department of Defense," as required by ASPR 1–905.1(b), and failed to maintain a close relationship with the cognizant contract administration office, as required by 1–905.1(c). Due to these failures, Shermco contends, Munch did not have substantial evidence to support his determinations. *See* ASPR 1.705.4(c)(vi).

Overhaul and repair contractors, such as Shermco, are required to obtain some of the parts used in their work through the Department of Defense Supply Systems. These parts are described as government-furnished material ("GFM"). If the parts are not "stock listed" and are not intended to be included in the price of the work, the contractor is authorized to purchase them locally and claim reimbursement. These parts are described as contractor-acquired material ("CAM"). For items that are supposed to be government furnished and which are not currently available through the Department of Defense Supply Systems, the contractor must follow certain procedures for assuring their "nonavailability" before purchasing them. *See* indictment, Plaintiffs' Exhibit 102.

Lawrence Weintrob was working for the Defense Supply Agency ("DSA") as an auditor when he became involved with Shermco:

In October 1975, The Auditor General, DSA, commenced an audit of Government Furnished Material in the control of contractors. Shermco Industries, Inc., a DCASR Dallas administered contractor, was selected as an audit sample, along with 65 other contractors in the continental United States. In my capacity as the Resident Auditor at DCASR Dallas, I was the Auditor-In-Charge of the audit of Shermco.

In December 1975, while the DSA audit of Shermco was well under way, the DCASR was contacted by the FBI about

an allegation that had been made by a former Shermco employee. As a result of a meeting and subsequent discussions with and requests by the United States Attorney and the FBI, and in light of some of the preliminary audit findings at Shermco, the scope of our DSA audit was significantly expanded.

Plaintiffs' Exhibit 153.

Based on this initial audit, the FBI concluded that Shermco had stolen GFM *and* filed false claims for reimbursement for CAM when it could have acquired GFM from the Department of Defense Supply System to do repairs.

In early 1976, the Defense Contract Administration Services Region ("DCASR") office in Dallas, the agency responsible for day-to-day administration of Shermco's government contracts, became concerned about Shermco's property control system. On June 15, 1976, DCASR Dallas withdrew its approval of Shermco's property control system, which meant that Shermco was ineligible to bid on government contracts, because it found that Shermco was inaccurately posting its inventory of GFM and that its stock cards did not match its stock balance of GFM. Stipulation No. 31, Exhibit 14.

On July 9, 1976, DCASR sent Munch the following telegram:

> This message updates [the] status of contractors [sic] property control system. Review performed 01 July 1976 by property administrator revealed deficient areas corrected to satisfactory. Contractors [sic] written procedures approved. Improved in acquisition, receiving and storage noted. Restoration of system approval withheld pending review of other categories; scheduled for completion 16 July 1976. You will be advised of survey results. Signed by: Clifton A. Horn, Colonel, USA Commander.

Stipulation No. 38, Exhibit 19.

On July 16, 1976, DCASR Dallas sent Munch a letter stating it had again approved Shermco's system because its quality control system was operating at an acceptable level of accuracy. Stipulation No. 40, Exhibit 21. The telegram and the letter indicate that, because Shermco had recently improved its recordkeeping, it was entitled to reapproval of its property control system. While the letter and telegram gave Shermco *prospective* approval of its property control system procedures, they did not clear it of allegations of *past* theft of GFM or false claims for CAM.

As part of its property control function, DCASR performs periodic inventories. During a June 1976, inventory of Shermco, there was a dispute regarding some "lost" GFM. On July 11 and July 12, 1976, the Administrative Contract Officer ("ACO") at DCASR wrote letters agreeing to settle its dispute with Shermco for $669.04. Second Supplemental Stipulation No. 6, Exhibit 4, page 1. In deciding whether to issue a COC on RFP 0814, the SBA reviewed these letters. After reviewing these letters, the SBA concluded that there was no evidence of intent indicated in the loss of GFM on prior contracts and that the ACO had relieved the applicant from responsibility of lost government property under the four prior contracts under investigations. The SBA's conclusion was confirmed with the ACO. Plaintiffs' Exhibit 87, p. 2.

The SBA also contacted several other officials at DCASR and concluded that Shermco had been given a clean bill of health as to the disappearance of government property on prior contracts and that there was no willful intent to steal the property. *Id.*

Although the SBA considered the information provided by DCASR Dallas critical to its decision to issue a COC on RFPs 0284, 0300 and 0814, *see* Plaintiffs' Exhibit 105, Munch did not speak with anyone at DCASR Dallas when he made his second responsibility determinations on RFPs 0284 and 0300 and, in fact, based these determinations solely on the FBI report. Supplemental Stipulation No. 14. He contacted no one at the U.S. Attorney's Office, the FBI, or Shermco during the 7 months prior to his determinations. Supplemental Stipulation No. 15. It was not until July 1977, a year after they were written, that Munch

even became aware of the letters between DCASR Dallas and the SBA. Plaintiffs' Exhibit 67.

Lawrence Weintrob performed an additional audit of Shermco in 1977. This audit was the only document other than the original FBI Report that Munch considered in making his September 12, 1977 responsibility determination on RFP 0814. By this time, the focus of the allegations against Shermco was solely on the filing of false claims for CAM. In fact, the draft indictment of October 1977, and the indictment that was returned in December 1977, refer only to false claims for CAM.

### 1. *RFPs 0284 and 0300*

■ The twin requirements that the procurement contracting officer ("PCO") obtain information from diverse sources and maintain a close relationship with the cognizant contract office in making responsibility determinations are both designed to increase input into the PCO's determinations. In making his December 3, 1976, determinations on RFPs 0284 and 0300, Munch failed to satisfy these requirements. Instead, he relied exclusively on the FBI report (which was in turn based on Lawrence Weintrob's 1975 audit) and did not talk with anyone at DCASR Dallas, the FBI or the U.S. Attorney's Office in making his decision. DCASR Dallas is staffed with people who are experts in property control; Munch should have contacted them concerning allegations about Shermco's handling of GFM and its claims for CAM.

Munch's ignorance of the ACO's letters finding that Shermco had no *willful intent* in the loss of GFM on a number of contracts affected the quality of his decision, particularly insofar as it was based on allegations of theft of GFM. This failure is compounded by the fact that the information compiled by DCASR Dallas was more current than the information on which the Weintrob audit was based, though the regulations require that the PCO make his decision on current, valid information. ASPR 1–905.1(b).

Shermco has also alleged that because Munch failed to obtain information from the DCASR Dallas or other sources, his determinations were not based on substantial evidence. The court has not found, and the parties have not cited, any cases defining "substantial evidence" in the context of ASPR 1–905 non-responsibility determinations, although the "adequate evidence" requirement of the suspension regulation of ASPR 1–605 is defined in *Horne Brothers*, above, at 1271:

The "adequate evidence" showing need not be the kind necessary for a successful criminal prosecution or formal debarment. The matter may be likened to the probable cause necessary for an arrest, a search warrant, or a preliminary hearing. This is less than must be shown at trial, but it must be more than uncorroborated suspicion or accusation.

This standard appears to be more stringent than a "substantial evidence" standard as it has been defined in other contexts. *See, e.g., Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971): "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.... The Court has adhered to that definition in varying statutory situations.".

■ Though Munch violated the regulations by not obtaining information from DCASR Dallas before making his determinations, the information on which he based these determinations was sufficient under the standard of either *Richardson v. Perales* or *Horne Brothers*. The FBI "Memorandum of Record" has been challenged on a number of grounds by Shermco, but it contained substantial evidence that Shermco had stolen GFM and made false claims for CAM. The "Memorandum of Record" is more persuasive evidence on the question of Shermco's integrity than the DCASR Dallas settlement letters because the settlement addressed only Shermco's theft of GFM but not the additional allegations that Shermco had made false claims for CAM. In addition, there is a serious question whether DCASR Dallas properly

handled settlement of the GFM claims. Tr. 255, 258–59. Moreover, as noted above, DCASR Dallas's approval of Shermco's property control system in July 1976, was *prospective* only and did not clear it of the allegations of *past* theft of GFM or false claims for CAM.

### 2. *RFP 0814*

■ A number of factors make this non-responsibility determination more reliable than, and consequently distinguishable from, the determinations on RFPs 0284 and 0300. First, when this determination was made, Munch was aware of the letters from DCASR Dallas absolving Shermco of responsibility for the loss of GFM. Plaintiffs' Exhibit 67. He discounted those letters because, at that time, the focus of the allegations against Shermco related solely to fraudulent claims for CAM.[19] Second, Munch had reviewed the 1977 Weintrob audit, which was more current than the DCASR Dallas letters. Third, Munch had an additional source of information whom he frequently consulted—the U.S. Attorney, Kenneth Mighell.[20] Finally, the "substantiality" of the information on which Munch based his determination is supported by the fact that it was the basis for a grand jury indictment. Given these factors, Munch's failure to maintain a "close relationship" with DCASR Dallas in making this determination was not a serious one.

### H. *Summary*

Munch's December 3, 1976, determinations not to award Shermco contracts on RFPs 0284 and 0300 were based on substantial evidence. The determinations were defective, however, because Munch ·failed to seek diverse sources of information, did not make maximum practical use of current information within the knowledge of the Department of Defense, and did not maintain a close relationship with DCASR Dallas, the cognizant contract administration office. The court finds no serious defects in Munch's handling of the determination on RFP 0814. Appropriate relief for the defective determinations on RFPs 0284 and 0300 is considered below.

### PART FOUR: RELIEF

### A. Damage Claims Against the Individual Defendants

### 1. Venue and Jurisdiction

■ As 28 U.S.C. § 1391(e) was construed in *Stafford v. Briggs*, 444 U.S. 527, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980), venue is not proper in this court for claims of monetary damages against the following individual defendants, who neither reside in this district nor had any of Shermco's claims against them arise in this district: Ralph Munch, the contracting officer; Max Alger, former Auditor General of the Defense Supply Agency; W.J. Kelly, an Air Force Brigadier General in charge of procurement and production; and Dewey Lowe, a Major General in the Air Force who directed its procurement policy.

■ This court has jurisdiction and proper venue as to Shermco's claims for monetary relief against Lawrence Weintrob, the auditor for the Defense Supply Agency, who resides in this district. Though defendant Munch does not reside in this district, the court may nonetheless exercise jurisdiction over state law claims against him by virtue of the Texas long-arm statute, article 2031b of the Texas Revised Civil Statutes, because he visited Texas in connection with the events giving rise to this litigation.

---

**19.** The exact time of the shift to an exclusive focus on fraudulent claims for CAM is not clear, but it appears to coincide with the completion of the Weintrob audit in June 1977. In stipulations entered on May 17, 1977, Munch indicated his belief that it would be appropriate to initiate suspension proceedings against Shermco if it were indicted for theft of government property. Supplemental Stipulation No. 17.

**20.** Although Mighell may not have performed an independent investigation of Shermco, Munch could count him as a "diverse source of information" because Mighell provided additional input through his review of the Weintrob data.

### 2. Tort Liability Alleged

Shermco's claims against defendants Weintrob and Munch are based either on common law torts (libel, negligence and invasion of privacy) or constitutional torts (deprivation of liberty interest by imposition of an "infamous badge of lack of integrity," and violation of its constitutional right to privacy under the fourth, fifth and ninth amendments).

#### a. Common Law Torts

■■■■■ The defendants, as federal officials, are shielded from liability for common law torts by official immunity for all acts committed in the course of official duties. *Evans v. Wright*, 582 F.2d 20, 21 (5th Cir.1978). Shermco neither alleged nor proved that Munch acted outside the scope of his authority. While there are allegations that Weintrob acted outside the scope of his authority, these allegations are not supported by the evidence. Weintrob's overall task was to protect the integrity of the procurement process. He received tacit approval from his director to expand his audit of Shermco and to provide his findings to the U.S. Attorney and the FBI. This approval was sufficient authority to shield Weintrob's actions from liability. A contrary finding would impose unacceptable limitations on the ability of the government to use the talents of investigators who are uniquely qualified and positioned to uncover fraud in the complex area of government procurement.

#### b. Constitutional Torts

■■■■ As to the constitutional torts alleged (liberty interest and privacy), officials whose allegedly wrongful actions are undertaken pursuant to the performance of their duties and within the scope of their discretionary authority are entitled to qualified immunity. Qualified immunity is an affirmative defense which is unavailable to those who either act with malice or who contravene clearly established law. *Williams v. Treen*, 671 F.2d 892, 896–97 (5th Cir.1982), *cert. denied*, 459 U.S. 1126, 103 S.Ct. 762, 74 L.Ed.2d 977 (1983). In light of the disposition below of Shermco's claims asserting a violation of its liberty interest and privacy rights, however, the applicability of qualified immunity to the present case need not be decided.

Courts have, in some circumstances, recognized a protected "liberty interest" in favor of government contractors. *See Transco Security*, above, at 321 and *Old Dominion*, above, at 961–66. Other decisions recognize a monetary remedy for invasion of such a liberty interest. *See generally Davis v. Passman*, 442 U.S. 228, 245, 99 S.Ct. 2264, 2277, 60 L.Ed.2d 846 (1979) and its progeny.

■■■■ This court need not, however, reach either of these issues. Assuming *arguendo* that Shermco had a protected liberty interest and a corresponding right to monetary damages for invasion of that interest, Shermco cannot prevail on these issues because it failed to establish, by a preponderance of the evidence, that it was stigmatized by the actions of either Weintrob or Munch. A person's fifth amendment "liberty" interest is invaded only when the party's reputation is *stigmatized* in connection with the denial of a specific constitutional guarantee or some more tangible interest. *See Paul v. Davis*, 424 U.S. 693, 701–11, 96 S.Ct. 1155, 1160–65, 47 L.Ed.2d 405 (1976).

Shermco asserts that Munch stigmatized it by influencing the United States Attorney to seek an indictment from the grand jury. No evidence supports this assertion. Munch cannot be held responsible for the United States Attorney's independent decision to take the case against Shermco to a grand jury. In addition, Munch was not directly responsible for the formal suspension of Shermco on February 7, 1978. Responsibility for that decision lies with the Air Force Suspension Board.

■■■ Although Munch did play an important role in the 1977 de facto suspension of Shermco, Shermco failed to establish that its suspension was ever made public. A party has not been stigmatized unless information regarding the party's reputation has been publicized. *Bishop v. Wood*,

426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976). *See Conset Corp. v. Community Services Administration,* 655 F.2d 1291, 1297 n. 12 (D.C.Cir.1981); *cf. In re Selcraig,* 705 F.2d 789, 796 n. 6 (5th Cir.1983). In the present case, the only tangible evidence of the de facto suspension was the June 7, 1977 non-responsibility determination. None of the non-responsibility determinations, whether made on June 16, 1976 (RFP 0284), December 3, 1976 (RFP 0300) or June 7, 1977 (resulting in de facto suspension), were made public outside the Air Force and the SBA. Any publication of these non-responsibility determinations occurred as a result of this lawsuit. A communication made in the course of this case, which did not commence until after the injury Shermco allegedly suffered and for which it seeks redress, cannot provide retroactive support for its claim. *Bishop,* above, 426 U.S. at 348, 96 S.Ct. at 2079.

Likewise, Shermco has not shown that Weintrob's actions stigmatized it. He did not influence the decision to indict Shermco; the formal suspension was proper, both procedurally and substantively; and the de facto suspension and non-responsibility determinations were not made public. Accordingly, even if the existence of a protected liberty interest in favor of Shermco is assumed, Shermco has failed to prove that the actions of either Weintrob or Munch damaged that interest.

Shermco also alleges that defendant Weintrob invaded its constitutional right to privacy. Specifically, Shermco contends that Weintrob invaded this right by conducting an investigation into its private business affairs (1) without advising it that he was working for the FBI, and (2) by creating a report that placed them in a "false light."

The protection afforded to one's privacy under the constitution is, by judicial construction, very narrow. The right to privacy protects only two categories of interest: (1) the individual interest in avoiding disclosure of personal matters; and (2) the interest in independence in mak-

ing certain kinds of important choices. *Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 876–77, 51 L.Ed.2d 64 (1977). Shermco has established no violation of a right to the first kind of privacy interest, the "right to confidentiality," because the preponderance of the evidence failed to show that Weintrob's report was ever disclosed to anyone outside the Air Force or the SBA. *See Fadjo v. Coon,* 633 F.2d 1172, 1175 (5th Cir.1981); *Plante v. Gonzalez,* 575 F.2d 1119, 1132 (5th Cir.1978), *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979). The only persons with access to Weintrob's report and any other negative reports on Shermco were government officials in the FBI, the Defense Supply Agency, the U.S. Attorney's Office and the Air Force. In fact, strict confidentiality limitations were placed on the FBI report. This limited scope of disclosure is a significant factor in the court's decision to deny Shermco's privacy claim. *See Nixon v. Administrator of General Services,* 433 U.S. 425, 450–52, 97 S.Ct. 2777, 2793–95, 53 L.Ed.2d 867 (1977) (only archivists could review presidential materials); *Whalen,* above, 429 U.S. at 593–96, 97 S.Ct. at 873–75 (reports of prescription information could only be reviewed by public employees). In view of the limitations on disclosure of Weintrob's work, and the complete lack of evidence that any disclosure in violation of the limitations occurred, Shermco's claim that its right to confidentiality was breached must fail.

Nor does Shermco's claim fare any better if grounded on the second category of protected interests in privacy—the "decisional" category. The privacy interest in independence in making decisions has been confined to matters such as marriage, procreation, contraception, family relationships, child rearing and education. *Fadjo,* above, at 1175. Shermco's claim, of course, involves none of these matters. This court declines to extend the right of privacy beyond these recognized borders.

In conclusion, since Shermco had no right to privacy under the "decisional" line of cases, and since Shermco failed to prove

that any public disclosure of adverse information concerning it occurred, defendants are entitled to judgment on Shermco's constitutional tort claims. Without a finding that either a liberty interest or privacy right of Shermco had been violated, the court need not decide whether the individual defendants are entitled to any form of immunity for such violations. .

### B. Non-Monetary Relief Against Defendant Air Force

In the pretrial order, Shermco requested that the court afford it the following relief against the Air Force:

1. A declaratory judgment that, as a matter of law, the Small Business Act requires the Air Force to award contracts to small business concerns after a certificate of competency has been issued by the Small Business Association, without further review of eligibility by the Air Force;

2. All applicable relief under the Administrative Procedure Act, 5 U.S.C. § 702, *et seq.*, including without limitation 5 U.S.C. § 704(A), (B) and (F);

3. Pursuant to 28 U.S.C. § 2202, that the Court set aside the contracts in dispute which have been awarded to other contractors and enter an order in the nature of a writ of mandamus and mandatory injunction directing the Air Force to honor the certificate of competency issued on January 16, 1978 by the Small Business Administration in favor of Shermco Industries, Inc. by awarding it all the contracts in dispute; and

4. Further relief.[21]

### 1. Declaratory Relief

Much of this request is based on the premise that once a COC is issued by the SBA, the procuring agency has absolutely no discretion to deny the contract to the contractor. This premise, however, was rejected when the court held that the Air Force properly denied Shermco the contracts on RFPs 0284 and 0300, in view of its determinations of non-responsibility, because the RFPs on these contracts were issued before the amendment of the Act effective in August, 1977. Even after August, the Air Force retained discretion to deny a contract to a contractor, despite issuance of a COC by the SBA, if it determined that suspension under ASPR 1–605 was justified. Shermco's request for declaratory judgment is denied.

### 2. Relief Under the Administrative Procedures Act

The Administrative Procedure Act defines the scope of judicial review for an administrative decision. In pertinent part it states:

The reviewing court shall—

---

21. In addition to RFPs 0284, 0300 and 0814, Shermco claims it was entitled to award of the contract on RFP 41608–77–R–B229 ("B229") which was pending at the time of its February 7, 1978, suspension. The Air Force properly exercised its discretion in determining not to award this contract to Shermco because, at that time, Shermco was under a valid suspension order based on adequate evidence. B229 was issued at Kelly Air Force base in San Antonio rather than at Sacramento, as were the other solicitations in question. All of the activity related to Shermco's *de facto* suspension was centered in Sacramento. There is no evidence that award of this contract was delayed before circulation of the suspension order throughout the Air Force on February 7, 1978.

Shermco also claims that its 5-year contract with the Air Force, No. FO4606–76–D0060 ("0060") should be reinstated. The evidence indicates the Air Force was justified in cancelling the 0060 contract. The Air Force had experienced a history of quality problems on 0060, and the contract included a provision allowing the Air Force to cancel it for such problems. The relationship between 0060 and RFPs 0284 and 0300 is disputed by the parties. Whatever this relationship is, the Air Force was justified in terminating 0060.

Shermco also mentions FO4604–76–R–0761 ("761"). 761 has no connection with the other RFPs in question. In the third year of a five year program, Shermco was deemed to have quality problems, so that this contract went competitive. Tayco was a lower bidder. Shermco protested to the GAO in October, 1976. This solicitation was delayed by Shermco's protest and further delayed because GAO was awaiting the outcome of an Air Force appeal from an adverse court decision on a Freedom of Information Act request.

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706.

This section allows agency action to be affected in one of two ways: compelled or set aside. The essence of Shermco's requested relief under this provision is that the Air Force be forced to set aside its previous determinations regarding Shermco, cancel any contracts it might have entered with other contractors regarding the contracts in question and then award the cancelled contracts to Shermco. This prayer for relief overlaps substantially, if not entirely, with Shermco's third requested form of relief. For convenience, those forms of relief will be discussed together.

3. *Cancellation of Existing Contracts, Award of those Contracts to Shermco and Other Relief*

The court has previously determined that Shermco was de facto suspended during 1977 without having an opportunity for rebuttal required by due process. In addition, the December 3, 1976 non-responsibility determination did not comply with the procurement regulation requiring that the contracting officer maintain a close relationship with the cognizant contract administration office and obtain the most current information available in making such determination. The court must now decide how, if at all, these wrongs against Shermco can be judicially remedied.

The violations in the present case are similar to the violations in *Old Dominion* and *Transco*. In each of those cases, the appellate court instructed the district court on remand to provide the contractor involved with notice of the charge and a hearing in which to "clear his name." Both *Old Dominion* and *Transco*, however, are factually distinguishable from the present case. In *Old Dominion*, the procuring agency was in the process of conducting suspension proceedings; in *Transco*, the contractor was still under suspension. The future for the contractors in those two cases was unknown. At the time of the litigation they could only anticipate continuing or future suspension.

In the present case, by contrast, the suspension against Shermco was lifted on March 10, 1978, only 31 days after it was imposed. Shermco has not, according to the evidence before the court, been returned to a "blacklist" posture in the more than five years since its suspension and has been free to pursue government contracts on the same footing as any other small business entity. The main aspect of Shermco's prayer for relief is its request that the contracts in question, which have either been awarded to other contractors or have been abandoned, be cancelled and then awarded to Shermco. The court declines to take what would now be such a drastic step to compensate Shermco. Over five years have gone by since the Air Force de facto suspended Shermco. At this late date, the contracts in question, which were awarded to other contractors have, in all probability, been performed in full. If they are not already completed, the conclusion that there has been significant progress and reliance on these contracts by other contractors is inescapable. If the contracts have been abandoned, it would constitute too much judicial interference in the Air Force's decision-making process, specifically relating to defense strategy, for the

court to require the Air Force to "revive" these contracts.

Shermco has cited the court to no authority where another court, under circumstances similar to the present case, has resorted to this form of extreme judicial remedy. *Cf. Art-Metal*, above, at 3 (GSA contracts in question held in abeyance and were not yet awarded to anyone); *Peter Kiewit Sons' Co.*, above, at 1152 (though court awarded the Barbers Point contract to the plaintiff, "[a]ward of the Barbers Point contract had been withheld, pursuant to a temporary restraining order and subsequently the consent of Defendants, until the hearing on the merits of Kiewit's complaint").

Moreover, there is nothing in the record to guarantee that Shermco would have received the contracts in question even if the Air Force's conduct in this case had been faultless. *See Old Dominion*, above, at 969:

> "There is nothing in the record to guarantee that Old Dominion would have received the Okinawa and Yokohoma contracts had it received the notice to which it was entitled. There are accordingly no grounds at this point to vacate the awards of those contracts to other contractors and grant them to ODDPI, as Old Dominion requests."

In fact, given the court's holding that the Air Force had substantial and adequate evidence to support its non-responsibility determination, it is not improbable that even if all procedural protections had been afforded Shermco, the Air Force would have, and properly could have, reached the same conclusion: that the contracts in question should not be awarded to Shermco.

■ Finally, the contracts should not now be cancelled and awarded to Shermco because the February 7, 1978 suspension and the non-responsibility determinations on RFPs 0284, 0300 and 0814 were based on adequate evidence. A court may overturn a procuring agency's disposition of a particular contract only where the agency does not have a "rational basis" for its

decision. *See Old Dominion*, above, at 960. In *Old Dominion*, the court stated that "contracting officers 'have very wide discretion,' and that a complaining bidder 'would normally have to demonstrate bad faith or lack of any reasonable basis in order to prevail.'" *Id.*

■ No bad faith on the part of any defendant has been established in this case. While Shermco alleged that the Air Force was seeking to make this a test case, the few isolated statements in the record to this effect do not reflect any particular *animus* against Shermco, but are rather the type of remarks one would expect from procurement officials who have been forced into a litigating posture. In contrast, the record sufficiently establishes that the Air Force had adequate evidence for its suspension of Shermco. Because the procuring agency had a rational basis for its actions, the court perceives no justification for awarding Shermco the contracts in question.

### 4. *Other Relief*

■ In addition to its other requests, Shermco has asked for an injunction "compelling defendants to expunge all statements in the FBI report and report No. 77–40 concerning plaintiff Shermco or other reference thereto from their files and to prohibit further distribution by defendants of same or any reference thereto." In light of this court's determinations that the information contained in the FBI report provided adequate evidence for the December 3, 1976 non-responsibility determinations and was part of the adequate evidence for the February 7, 1978 suspension, it would be inappropriate to expunge this information from Air Force files.

In addition, there is no evidence that the Air Force has ever distributed, or intends in the future to distribute this information, except to the U.S. Attorney and the SBA. Under these circumstances, the court sees no need to enter an order requiring expungement or prohibiting any distribution of the information on file in this case.