**Hugo R. MAINELLI, Jr., et al.,**

v.

**The UNITED STATES of America, et al.**

**Civ. A. No. 85–0293 P.**

United States District Court, D. Rhode Island.

June 6, 1985.

---

John Walsh, Joseph Kelly, Alden Harrington, Providence, R.I., for plaintiffs.

Everett C. Sammartino, Asst. U.S. Atty., Thomas Caruolo, Sp. Asst. Atty. Gen., Providence, R.I., for defendants.

## OPINION AND ORDER

PETTINE, Senior District Judge.

On May 16, 1985, the Federal Highway Administration ("F.H.W.A.") of the United States Department of Transportation ("U.S.D.O.T.") suspended from any and all participation in U.S.D.O.T. financial assistance programs plaintiffs Hugo R. Mainelli, Jr., Mariano Jose Brown, Brenda Francis Brown, Aetna Bridge Holding Company ("Holding Company"), Aetna Bridge Company ("Aetna Bridge"), B&F Excavating, Inc., ("B&F"), Aetna Bridge-B&F Excavating Co., Inc., A Joint Venture ("Joint Venture"), and Aetna Bridge-B&F Excavating—Joint Venture II ("Joint Venture II"),[1] who are individuals and corporate entities engaged in the construction industry in Rhode Island. According to the letter suspending the plaintiffs, the U.S.D.O.T. acted in response to a Rhode Island grand jury indictment of the plaintiffs charging fraud in obtaining and performing state construction contracts partially funded by the U.S. D.O.T. On May 21, 1985, the plaintiffs brought suit in this Court, seeking a temporary restraining order, a preliminary injunction, and permanent injunctive and declaratory relief against the suspension and the federal regulations, 49 C.F.R. § 29 *et seq.* (1984), pursuant to which suspension was ordered.[2] Plaintiffs allege that the regulations violate their Fifth Amendment rights and, by their Amended Complaint filed on May 30, 1985, further allege that the U.S.D.O.T. is barred by the doctrines of *res judicata* and collateral estoppel from suspending the plaintiffs. No temporary restraining order issued but, in consideration of the exigent circumstances surrounding this matter—circumstances described

*infra*—the Court set the matter down for an expedited hearing on the preliminary injunction. That hearing was held on May 30 and 31, 1985.

## I. BACKGROUND

The sequence of events culminating in this lawsuit has been fully set forth in the plaintiffs' memoranda and at the hearing on the preliminary injunction. In view of the importance of a prompt decision in this matter, and the fact that this case turns largely on questions of law, the Court will recount here only the essential facts as it finds them.

In 1983, plaintiff Mainelli, president of Aetna Bridge, and plaintiff Brown, president of B&F, formed Joint Venture I to bid on, and, if successful, to perform, as a subcontractor, certain construction work on the Capital Center Project in Rhode Island. That project was administered primarily by Rhode Island Department of Transportation ("R.I.D.O.T.") officials, and was funded partly with federal monies. B&F is a 100% owned and controlled minority business enterprise, and has been certified by the state as a Minority Business Enterprise, ("M.B.E."), as that term is defined at 49 C.F.R. § 23, *et seq.* (1984). So certified, B&F is eligible to participate in federally financed projects that require contractors to set aside 10% of the work for such enterprises. Because B&F has a 95% interest, and Aetna Bridge a 5% interest, in the Joint Venture, that Joint Venture itself met federal eligibility requirements as an M.B.E.

In 1983, the Gilbane Construction Co. was awarded the general contract for the Capital Center Project and the Joint Venture was approved as a subcontractor. In early 1985, however, authorities received an anonymous letter suggesting that the Joint Venture had improperly subcontracted work to a non-minority enterprise and

---

1. Although Dominion Rebar Company, a steel supply corporation in which plaintiff Hugo R. Mainelli is a principal, is also named as a plaintiff, the defendant U.S.D.O.T. has stated on the record that Dominion Rebar is not suspended from participation in U.S.D.O.T. assisted

projects. Indeed, Dominion Rebar was sent no suspension notice.

2. In pertinent part, the U.S.D.O.T.'s regulations regarding suspension of contractors are attached to this opinion as Appendix A.

had violated federal regulations by so doing. In January, 1985, at the urging of local F.H.W.A. administrator Gordon G. Hoxie, R.I.D.O.T. conducted a review of the allegations in order to determine whether the Joint Venture was a *bona fide* M.B.E. In particular, R.I.D.O.T. was to determine whether, in light of the subcontracting to a non-minority firm, the Joint Venture was performing, as the federal regulations require, a "commercially useful function," 49 C.F.R. § 23.47(d)(1). Pursuant to its investigation, R.I.D.O.T. convened hearings, at which the parties were interviewed and documentary evidence was received. On March 8, 1985, R.I.D.O.T. issued its report, concluding that the Joint Venture had violated certain technical aspects of the M.B.E. regulations, and should accordingly be put on probation for a one year period. The panel concluded, however, that, in "reality," no violation had occurred and decertification would therefore be inappropriate. This report was delivered, *inter alia,* to Gordon Hoxie. By letter of March 13, 1985, Hoxie responded to the report by stating that he believed it appropriate to place the Joint Venture on probation, but that federal authorities had remaining questions as to certain of R.I.D.O.T.'s findings, as well as to the hearing procedures R.I.D.O.T. employed in its investigation.

On March 22, 1985, a Grand Jury sitting in the Rhode Island Superior Court returned a 59 count indictment against Mainelli, Mariano Brown, Brenda Francis Brown, the Holding Company and B&F. That indictment in substance charged the plaintiffs with creating a false and fraudulent joint M.B.E. in connection with the Capital Center Project, and with falsifying records as part of that fraud.

On May 16, 1985, the U.S.D.O.T., by letter of Rex C. Leathers, Initiating Official, advised the plaintiffs that the F.H.W.A. had determined

> that there is adequate evidence that your company committed acts which, under Part 29 of Title 49, Code of Federal Reg-

ulations, constitute grounds for suspension and eventual debarment from participation in United States Department of Transportation (DOT) financial assistance programs.

> Exhibits B–E to Plaintiffs' Verified Complaint.

The letter went on to describe the charges contained in the indictment, and to characterize the indictment as "supported by and result[ing] from an investigation conducted by the Rhode Island Attorney General's office in cooperation with the U.S.D.O.T.'s Inspector General's office." It further advised plaintiffs of the duration of the suspension and of their right, under 49 C.F.R. § 29.33, to a hearing within 30 days of a written request for same.

Within five days of receiving their respective notices, plaintiffs brought this suit. They sought immediate relief against the suspension because it would prevent them from obtaining other contracts for which R.I.D.O.T. had already found them to be the lowest responsible bidder, but which could not be finally awarded to them absent federal concurrence.[3] In particular, the state was and is prepared to award B&F/Aetna Bridge Joint Venture II, as general contractor, a several-million dollar contract for the Civic Center Interchange Project. Even after the indictment in the Rhode Island Superior Court was returned, R.I.D.O.T. adhered to its belief that Joint Venture II should be awarded this contract and, on April 5, and May 16, 1985, respectively, R.I.D.O.T. wrote to the U.S.D.O.T. seeking the required concurrence. Immediately after suspending the plaintiffs, U.S. D.O.T. formally denied concurrence. R.I. D.O.T. has not yet awarded this contract to the next lowest bidder—whose bid is some $600,000 higher than that of Joint Venture II—but has taken the position throughout this litigation that various circumstances mandate that it award that contract immediately.

Similarly, B&F has also submitted, on its own, a bid to be a subcontractor on the

---

**3.** It was established early in this litigation, by agreement of the parties, that the suspension would not apply to contracts already in progress, such as the Capital Center Project.

Jamestown Bridge Project, another R.I.D.O.T. project funded partially by U.S.D.O.T. R.I.D.O.T. has approved Clark-Fitzpatrick, Inc., of New York, as the general contractor on that project and, absent this suspension, B&F was to have been an M.B.E. subcontractor for Clark-Fitzpatrick. As with the Interchange Project, R.I.D.O.T. is still prepared to award the contract to Clark-Fitzpatrick, with B&F as a subcontractor. The F.H.W.A., however, has notified R.I.D.O.T. that it will not concur in any award to B&F.[4]

Through their verified complaint and hearing testimony, the plaintiffs have stated that, given the nature of their work, loss of the two above-described contracts, coupled with loss of the ability to bid on any future contracts, will put each out of business. The Court has no reason to doubt plaintiffs' estimation of the consequences that will flow from continued suspension.

As these facts demonstrate, this case presents an unusual and anomalous situation—one in which a state agency is urging federal approval of contractors, in the face of a state grand jury indictment that triggered the federal suspension at issue. And this is a situation in which the consequences of federal suspension will be great. If the plaintiffs continue to be suspended, the result will be that the Interchange Project will cost at least an additional $600,000 to complete, and, a minority contractor may meet its demise. On the other hand, the Court must view these circumstances in the context of a federal scheme that is designed to encourage minority contracting, and to protect the integrity of the minority set-aside program. Moreover, in undertaking its duty, this Court is and must be controlled by established legal principles, and required to apply these principles dispassionately.

## II. DISCUSSION

The standard that I must apply in determining whether to issue a preliminary injunction is well settled in this Circuit:

'In the First Circuit, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.'

*LeBeau v. Spirito,* 703 F.2d 639, 642 (1st Cir.1983) (quoting *Women's Community Health Center v. Cohen,* 477 F.Supp. 542, 544 (D.Me.1979) (citations omitted)).

In the present case, there can be little doubt that plaintiffs have carried their burden to show that irreparable injury will result if the relief they have requested is denied. Given the fact that plaintiffs' businesses depend so heavily on obtaining U.S. D.O.T.-financed contracts, suspension pending resolution of the state criminal proceedings, or for up to eighteen months, *see* 49 C.F.R. § 29.27, may well sound the death knell for these enterprises. In view of this threatened injury I likewise conclude that the balance of the equities tips decidedly in plaintiffs' favor. I am sensitive to the severe hardship that may be visited upon the plaintiffs and, were the preliminary injunctive inquiry to end after consideration of these two factors, I would likely be disposed to issue an injunction. As I have indicated above, however, the inquiry cannot properly be limited to the equities of the situation. Indeed, the First Circuit has made clear that "even where irreparable injury is 'excruciatingly obvious,' plaintiffs must show probability of prevailing on the claims to obtain [a] preliminary injunction." *Id.* at 642 (citing and quoting in part *Coalition for Basic Human Needs v. King,* 654 F.2d 838, 841 (1st Cir.1981)). Having examined the legal bases upon which plaintiffs seek relief, I cannot find here any

---

**4.** By agreement of the parties, Clark-Fitzpatrick will be allowed to proceed with the Jamestown Bridge Project at this point, without an ap-proved M.B.E. subcontractor, and to substitute another M.B.E. at a later point if B&F's suspension continues in force.

likelihood that they will succeed on the merits of their claims. I discuss briefly each claim in turn.

## A. Res Judicata/Collateral Estoppel

On the first day of the oral hearing on this matter, plaintiffs amended their complaint to supplement their constitutional challenges to the suspension regulations with a claim that the U.S.D.O.T. is barred from suspending the plaintiffs by the doctrines of *res judicata* and collateral estoppel. Plaintiffs believe that the March 5, 1985 determination by the R.I.D.O.T., finding that the Joint Venture had committed no substantive violation of the M.B.E. regulations through its subcontracting, should be accorded preclusive effect by the U.S.D.O.T. They point to the fact that the issue before the R.I.D.O.T.—whether the Joint Venture was a fraudulent or sham M.B.E. —is the same issue now before the U.S.D.O.T. in its suspension action. The defendant U.S.D.O.T. counters that this Court lacks jurisdiction to decide the *res judicata/* collateral estoppel issue because the plaintiffs must first exhaust their administrative remedies.

"It is well settled that before judicial relief can be granted to a party he must have exhausted applicable administrative remedies." *Shick v. Farmers Home Administration of United States Department of Agriculture,* 748 F.2d 35 (1st Cir. 1984) (citing *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938)). While the exhaustion requirement is not strictly jurisdictional in nature, *see Ezratty v. Commonwealth of Puerto Rico,* 648 F.2d 770, 774 (1st Cir. 1981); *Beins v. U.S.,* 695 F.2d 591 (D.C.Cir. 1982), courts have firmly adhered to the rule and have recognized that "requiring litigants to exhaust 'prevents the disrup-

tion of administrative processes by withholding judicial review until the agency has developed the relevant facts, applied its expertise and exercised the discretion entrusted to it by law,'" *Strang v. Marsh,* 602 F.Supp. 1565, 1575 (D.R.I.1985) (*quoting Elton Orchards v. Brennan,* 508 F.2d 493, 497 (1st Cir.1974)).

■ In the present case, the plaintiffs' claim of *res judicata* or collateral estoppel is, by its nature, a defense to be properly asserted before the U.S.D.O.T. in the first instance. Indeed, in a similar factual context, the Supreme Court has held that one seeking to enjoin administrative proceedings on the ground that they are barred by *res judicata* must exhaust administrative remedies before invoking the equitable powers of a federal court. *S.E.C. v. Otis & Co.,* 338 U.S. 843, 70 S.Ct. 89, 94 L.Ed. 516 (1949) (per curiam), *rev'g* 176 F.2d 34 (D.C. Cir.1949) (summary reversal on authority of *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938) and other exhaustion cases). The *Otis* principle must govern here, for it would surely subvert the administrative scheme to allow affected contractors to bypass designated agency processes and litigate their suspensions in federal court in the first instance.[5] *See Peter Kiewit Sons' Co. v. United States Army Corps of Engineers,* 714 F.2d 163, 167–68 (D.C.Cir.1983) (ruling that government contractor must exhaust administrative remedies before challenging debarment). Accordingly, I conclude that the exhaustion rule bars judicial review at this point of the *res judicata/* collateral estoppel defense.

■ I recognize that the exhaustion rule is subject to waiver in certain limited, albeit "most exceptional circumstances." *Peter*

---

**5.** This is especially so here, where plaintiffs do not and cannot know, without resort to an agency hearing, whether the U.S.D.O.T. has acquired, through its Inspector General's investigation, new evidence supporting a finding of fraud—evidence that was not previously available to the R.I.D.O.T. If such new evidence were available, the prior determination would likely lack preclusive force. *See Safir v. Gibson,* 432 F.2d 137, 144 (2nd Cir.1970), *cert. den.,* 400 U.S. 850, 91

S.Ct. 57, 27 L.Ed.2d 88 (1970); *cf. Springfield Television Corp. v. F.C.C.,* 609 F.2d 1014, 1019 (1st Cir.1979). While it is true that the U.S.D. O.T. need not disclose all the evidence it has during its hearing proceedings, it is nevertheless the case, as the U.S.D.O.T. has conceded in this action, that it will bear the burden of proving that it has "adequate evidence" to warrant suspension.

*Kiewit Sons' Co., supra,* 714 F.2d at 162–163 (quoting 4 K. Davis, *Administrative Law Treatise,* § 26.10 at 460 (1983)). Where, for example, a litigant demonstrates that exhaustion would be futile, or work a severe harm upon it, it is within a court's discretion to decline to apply the rule. *See, e.g., Ezratty v. Commonwealth of Puerto Rico, supra,* 648 F.2d at 774; *Strang v. Marsh, supra,* 602 F.Supp. at 1575. Even were I to conclude that the exhaustion rule should not be applied here, however, I could not find that plaintiffs are likely to succeed on the merits of their preclusion claim. While I need not and do not decide whether all the prerequisites for the application of administrative *res judicata* and/or collateral estoppel could be satisfied on the facts of this case, *see United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 421–22, 86 S.Ct. 1545, 1559–60, 16 L.Ed.2d 642 (1966) (discussing requirements); *Restatement (Second) of Judgments,* § 83 (1982), I note at least two factors that suggest that the state administrative determination would not likely be found to preclude the federal suspension action.

First, I do not believe that plaintiffs could establish the identity of parties necessary to apply the doctrine of preclusion against the federal government, nor do I believe that they could establish the correlative requirement that the federal government had a full and fair opportunity to litigate their suspension claim in the state decertification proceedings. While plaintiffs have cited cases finding an identity of parties between officials of the "same government," *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 402–403, 60 S.Ct. 907, 916–917, 84 L.Ed. 1263 (1940), they present no authority for the novel proposition that a *state government* is identical to the *federal government.*[6] Nor is this surprising, for to prevent the federal

government from exercising its suspension prerogative based on what a state agency has previously found in a decertification investigation would undercut the regulatory scheme—which allows the federal government to proceed whenever there is "adequate evidence" to do so and without regard to whether evidence sufficient to support its suspicion may have been lacking at some prior point. *See Restatement (Second) of Judgments,* § 83(4)(b) (1982) (no bar to relitigation of issue "if according preclusive effect to [prior administrative] determination of the issue would be incompatible with a legislative policy that ... [t]he tribunal in which the issue subsequently arises be free to make an independent determination of the issue in question"); *see also United States v. Lasky,* 600 F.2d 765, 768 (9th Cir.1979) (citations omitted) (administrative *res judicata* and collateral estoppel applied less rigidly than their judicial counterpart and must not be applied where to do so would contravene public policy).

■ Second, plaintiffs themselves concede that, for purposes of collateral estoppel, a change in the controlling factual circumstances deprives a prior determination of preclusive effect, *see Montana v. United States,* 440 U.S. 147, 155, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979). Here, in addition to the possibility that the U.S.D.O.T.'s own investigation uncovered new facts, there is the plain fact that an indictment was returned after R.I.D.O.T.'s decision. In light of the fact that the federal suspension regulations expressly identify an indictment as a circumstance so probative as to itself warrant suspension, it would seem apparent that the fact of an intervening indictment is a changed circumstance rendering collateral estoppel inapplicable.

---

**6.** As a factual matter, while the record in this case bears out plaintiffs' claim that the federal government *initially urged* R.I.D.O.T. to investigate the allegations of fraud, it does not support the claim that the U.S.D.O.T. in any way participated in or controlled the investigation, nor does it demonstrate that U.S.D.O.T. fully en-

dorsed or acquiesced in R.I.D.O.T.'s findings. To the contrary, on the Court's reading, Gordon Hoxie's March 13 letter to Joseph Pezza of R.I. D.O.T. suggests that the U.S.D.O.T. had a number of difficulties with R.I.D.O.T.'s factual findings, as well as the hearing procedures it employed.

In light of the foregoing discussion, I cannot find that plaintiffs have a probability of success on their *res judicata*/collateral estoppel claim.

## B. *Constitutional Challenge*

### 1. *Due Process*

Plaintiffs allege that the U.S.D.O.T.'s suspension regulations deprive them of the due process of law guaranteed to them by the Fifth Amendment of the Constitution. I will not describe the regulatory scheme in detail, inasmuch as the regulations are attached as Appendix A to this opinion. The gist of the regulations is, however, that the U.S.D.O.T. may suspend a contractor upon "adequate evidence" that various forms of misconduct have occurred, including "[c]ommission of a fraud or any criminal offense as an incident to obtaining ... or performing government business or a public contract," 49 C.F.R. § 29.23(a)(1); that an outstanding indictment or information shall constitute "adequate evidence of suspected criminal conduct and may be the basis for the imposition of a suspension," *id.* at § 29.23(b); that a suspended person is entitled to a hearing within thirty days of its written request for one, *id.* at § 29.-33(a); and that "[w]here a suspension is based solely upon an indictment ... the suspended person shall be limited to an opportunity to submit documentary evidence and written briefs, except that, where good cause is shown as to why an oral hearing should be held, the hearing officer shall grant a request for such a hearing," *id.* at § 29.33(b).

Plaintiffs' first due process contention is that the regulations are procedurally defective in that they fail to give contractors a hearing *before* the suspension is ordered.

Any procedural due process inquiry must begin with the question whether the plaintiffs can demonstrate that they have a cognizable property or liberty interest at stake. *See, e.g., Cleveland Board of Education v. Loudermill,* — U.S. —, —, 105 S.Ct. 1487, 1490–91, 84 L.Ed.2d 494 (1985). On the record of this case, plaintiffs can clearly establish a protected liberty interest. Cases construing analogous federal suspension regulations have uniformly held that the liberty interests of government contractors are implicated where a suspension is based on charges of fraud and dishonesty.[7] *See, e.g., A.T.L., Inc. v. United States,* 736 F.2d 677, 682–683 (Fed.Cir.1984); *Transco Sec., Inc. of Ohio v. Freeman,* 639 F.2d 318, 321 (6th Cir.1981); *Old Dominion Dairy v. Secretary of Defense,* 631 F.2d 953, 961–964 (D.C.Cir.1980); *Shermco Industries v. Secretary of the Air Force,* 584 F.Supp. 76, 87–88 & n. 7 (N.D.Tex.1984).

Having found a liberty interest at stake here, the next question would be whether plaintiffs were deprived of their liberty without adequate " 'notice and opportunity for hearing appropriate to the nature of the case.' " *Loudermill, supra,* — U.S. at —, 105 S.Ct. at 1493 (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950) ). The process due in a given situation depends upon a balance of the private interest involved, the risk of an erroneous deprivation and the probable value, if any, of additional procedural safeguards. *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–903, 47 L.Ed.2d 18 (1976).

Here, the plaintiffs have not challenged the sufficiency of the notice and, indeed, the notice they received from the U.S.D.

---

**7.** I do not find meritorious plaintiffs' argument that the particular facts of this case establish a property, not only liberty, interest. Plaintiffs believe that because they have already been found by the state to be lowest responsible bidders on the Interchange and Jamestown Bridge Projects, they have acquired a property interest in those contracts. I cannot agree because, as plaintiffs acknowledge, no "entitlement" can

arise where the interest claimed remains subject to conditions. Pl. Trial Memorandum, at 31 (citing *Reed v. Village of Shorewood,* 704 F.2d 943, 948 (7th Cir.1983) ). Here, the state's readiness to award the contract to plaintiffs, no matter how sincere, is wholly conditional on federal concurrence—which, of course, the U.S.D.O.T. has denied.

O.T. would appear to satisfy constitutional requirements. *See Shermco Industries v. Secretary of the Air Force, supra,* 584 F.Supp. at 88–89 (discussing notice required where suspended contractor has been indicted).[8] Turning to whether due process required a pre-suspension hearing here, I cannot find plaintiffs likely to succeed on this claim. In a line of decisions concerning the hearing rights of suspended contractors dating back to Judge Leventhal's opinion for the D.C.Circuit in *Horne Brothers v. Laird,* 463 F.2d 1268 (D.C.Cir. 1972), it has been consistently held that due process is satisfied so long as a contractor who is *formally suspended, cf. Old Dominion, supra,* at 966, has a meaningful rebuttal opportunity—whether it be an oral hearing or otherwise—after the suspension. *See, e.g., Horne Bros., supra,* at 1270; *Transco, supra,* at 322–323; *Shermco, supra,* at 89–90. Indeed, the precise requirement announced in *Horne Bros.* —that the contractor must receive a rebuttal opportunity within thirty days, so as not to "dangle in suspension for a period of one year or more," *id.* at 1271—appears to have been incorporated into not only U.S.D.O.T.'s suspension regulations, but into government-wide procurement regulations, as well. *See* 48 C.F.R. 9.407–3(5) (1984). Because prior decisional law has balanced the competing interests and held that a post-suspension hearing within thirty days is sufficient, and because that principle has been incorporated into the suspension regulations challenged here, I cannot find probable success in plaintiffs' procedural due process claim.

Plaintiffs' second due process argument is that the regulations are unconstitutional in that the post-suspension hearing provided cannot be meaningful because the government is free to rest a suspension on the basis of an indictment alone, irrespec-

tive of the showing made by the contractor at the hearing.

Whether this challenge is denominated an additional "procedural due process" claim or a "substantive due process" claim, *see Schiller v. Strangis,* 540 F.Supp. 605, 613–615 (D.Mass.1982) (discussing differences between two types of due process claims); I do not find it likely to succeed. In essence, the regulations provide that the government has the right to refuse temporarily to deal with a contractor about whom there is suspicion, based on "adequate evidence," of serious misconduct. The "adequate evidence" showing has been likened to probable cause. *See Horne Bros., supra,* 463 F.2d at 1271. In the case of an indictment, the very fact that a grand jury has returned an indictment suggests that there is sufficient suspicion to meet this standard. The function of the hearing provided an indicted contractor is, as I read these regulations, to provide for an independent evaluation of the factual basis supporting an indictment and to ensure not that the contractor is *guilty,* but that the requisite suspicion is present. If the regulations contemplated no such independent review, then no hearing opportunity at all would presumably have been granted. And, as the government concedes in this case, it is the government that bears the burden of making that showing at the hearing. Moreover, according to the suspension notices sent to the plaintiffs, and to the government's representations in this lawsuit, this suspension was based not on the fact of the *indictment alone,* but also on evidence gathered in U.S.D.O.T.'s own investigation, conducted in conjunction with the Rhode Island Attorney General. Taking all of these considerations together, I find no probable success on this due process claim. This is especially so because, to the extent that this claim is properly characterized as a substantive due process

---

**8.** Indeed, the Court expressly inquired in open court whether the U.S.D.O.T.'s Inspector General's Report, upon which the plaintiffs' suspension was partially based, contained evidence of acts of misconduct other than those charged in the indictment. Had the Report contained such charges, there might well have been a notice

problem here, because the suspension letter sent to plaintiffs referred only to the allegations of fraud encompassed in the indictment. *See Transco Sec., Inc., supra,* at 323 (notice must apprise affected party of charges so as to permit adequate preparation for hearing).

argument, the standard it must meet to succeed is extremely high. *See, e.g., Rochin v. California*, 342 U.S. 165, 169, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952) (where substantive due process alleged to have been violated, conduct must be such as to "shock the conscience").

### 2. The Fifth Amendment Privilege Against Self-Incrimination

Plaintiffs' final claim is that the regulation under which they were suspended violates, on its face, their Fifth Amendment privilege against self-incrimination.[9] They believe it does so by compelling them, on pain of losing their businesses, to participate in a post-suspension hearing and to thereby risk prejudicing their criminal defense. I do not find sufficient merit in this claim to warrant preliminary injunctive relief.

█ As plaintiffs acknowledge, it is not *inherently unconstitutional* for the government to proceed with parallel civil and criminal proceedings. *See United States v. Kordel*, 397 U.S. 1, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970); *S.E.C. v. Dresser Industries*, 628 F.2d 1368 (D.C.Cir.1980); *Arthurs v. Stern*, 560 F.2d 477 (1st Cir.1977); *Coalition of Black Leadership v. Cianci*, 480 F.Supp. 1340 (D.R.I.1979). These cases recognize the principle that protection of the public interest may often require proceeding simultaneously on two fronts, and that it would unduly compromise the public interest to force the government to choose between a civil and criminal course of action. *See United States v. Kordel, supra*, 397 U.S. at 11, 90 S.Ct. at 769. To be sure, where "special circumstances," *id.* at 11, 90 S.Ct. at 769, are present that suggest "agency bad faith or malicious governmental tactics," *S.E.C. v. Dresser, supra*, at 1375, parallel proceedings may well be "unconstitutional or improper," *id.* at 1375. Indeed, a court always has discretion to stay civil proceedings where it finds that the prejudice to a criminal defendant's

rights warrants such action. *Id.* at 1375–76 (noting that risk of prejudice is especially high where indicted criminal defendant is required to defend civil or administrative action regarding same matter). That a court retains such *discretion*, however, does not translate into the mandatory rule that plaintiffs seek—namely, that the government *must* stay any suspension action against an indicted contractor pending close of the criminal proceedings. This is so for at least two reasons.

First, such a rule would lead to the perverse result that the government could suspend only *unindicted* contractors—about whom relatively less, or at least less formal, suspicion is harbored than indicted contractors.

Second, such a rule would leave unprotected the public interest in safeguarding the integrity of the public contracting process—and here, the integrity of the laudable minority set-aside program. It would do so by preventing the government from taking any temporary action against indicted contractors. For what plaintiffs urge is not that the suspension *hearing* be stayed, but that the *suspension itself* be stayed. As other courts have recognized, however, from the fact that in a particular case civil proceedings must be stayed in order to protect a criminal defendant's rights, it does not necessarily follow that "the public must be left without protection." *Silver v. McCamey*, 221 F.2d 873, 879 (D.C.Cir.1955). It more likely means that a substitute measure must be utilized—such as a temporary suspension without hearing, *id.* at 875; *cf. Horne Bros. v. Laird, supra*, at 1271 (where considerations of public interest are sufficiently weighty, suspended contractor may be denied hearing within one month of its suspension). Indeed, in some way the regulations at issue here attempt to accommodate these competing interests, for they do not literally require that plaintiffs come forward, as in cases where a refusal to speak or produce evidence is *itself* the

---

**9.** Of course, only the individual, and not the corporate, plaintiffs enjoy the protection of the Fifth Amendment privilege. *See, e.g., United*

*States v. Kordel,* 397 U.S. 1, 8 & fn. 9, 90 S.Ct. 763, 767 & fn. 9, 25 L.Ed.2d 1 (1970) (collecting cases).

cause of the suspension or loss involved. *See Lefkowitz v. Cunningham,* 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977); *cf. Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976).

In saying this, I do not mean to be formalistic, nor am I blind to the very difficult position in which plaintiffs have been placed as a result of their simultaneous indictment and suspension. If I were writing on a clean slate in this area, I might view plaintiffs' Fifth Amendment challenge somewhat differently. In light of the cases concerning parallel proceedings, however, as well as those recognizing the importance of the federal interest in this area, I am constrained to find no probable success on plaintiffs' claim.

■ For all of the foregoing reasons, plaintiffs' motion for a preliminary injunction is DENIED.

## APPENDIX A

### PART 29—DEBARMENTS, SUSPENSIONS AND VOLUNTARY EXCLUSIONS

#### Subpart A—General Provisions and Definitions

#### § 29.1 Policy.

It is essential to the accomplishment of the Department's mission that recipients of its financial assistance do business under a DOT financial assistance program only with participants who properly use federal financial assistance program funds. Accordingly, participation in DOT financial assistance programs shall be denied to those participants who have been suspended or debarred under this part.

#### § 29.3 Purpose.

This part sets forth rules for the debarment of and other measures against participants or affiliates where it is demonstrated that government funds may not be properly utilized or the federal interest would not be safeguarded. These measures shall be used to protect the public interest and are not intended to be sanctions, penalties, or forms of punishment. These measures do not apply to states, state agencies, local governments or entities which do not act, or intend to act, as contractor or subcontractor to a recipient. These measures do not apply to suspension or debarment with respect to direct government contracting or to a person acting as a DOT grantee or a party to a DOT cooperative agreement.

#### § 29.5 Authority.

This part is issued pursuant to section 322 of Title 49, United States Code, which authorizes the Secretary of Transportation to prescribe regulations to carry out the duties and powers of the Secretary.

#### § 29.7 Authorized measures.

This part sets forth rules for the imposition of the following:

(a) *Suspension.* Suspension is the action taken under Subpart B of this part to disqualify a person temporarily from participation in DOT financial assistance programs.

(b) *Debarment.* Debarment is the action taken under Subpart C of this part, after opportunity for a hearing, as provided under § 29.51, to deny a person participation in DOT financial assistance programs for a period generally not to exceed three years.

#### § 29.9 Voluntary exclusion.

Voluntary exclusion is the denial of participation in any DOT financial assistance program as a result of an agreement voluntarily entered into, under § 29.63 of this part, between the Department and the person to be excluded.

#### § 29.11 Applicability.

This part applies to participants or affiliates in any program for which DOT financial assistance is authorized under a law administered by the Department, including, but not limited to, those listed in Appendix A to this part. A person is subject to the measures set forth in this part, if cause for imposing the measures is shown and the procedures provided in this part are followed. A person may be subject to measures under this part whether or not he or she was participating in a DOT financial assistance program at the time of the con-

duct on which the measure is based and whether or not that person acted individually, in behalf of others, or in a private or public capacity. This part applies to suspensions and debarments of persons doing business with recipients of DOT financial assistance initiated after its effective date regardless of the date of the cause giving rise to the suspension or debarment. Debarments of persons doing business with recipients of the Federal Highway Administration initiated before the effective date of this part shall be governed by 23 CFR Part 16. Where the Department is required by statute, regulation, or Executive Order to follow administrative suspension or debarment procedures that may differ from the requirements of this part, the statutory, regulatory or Executive Order procedures shall take precedence.

§ 29.13   **Definitions.**

(a) *Adequate evidence* means information sufficient to support the reasonable belief that a particular act or omission has occurred.

(b) *Administrator* means the head of an operating administration. With respect to DOT financial assistance programs administered by the Office of the Secretary, administrator means the Assistant Secretary for Administration. An administrator may delegate any of his or her functions under this part and authorize successive redelegations within his or her operating administration. However, the functions of an administrator, under § 29.35 or § 29.53, may not be delegated to an official who has acted as initiating official in the case at hand.

(c) *Affiliates.* Persons are affiliates if, directly or indirectly, (i) either one controls or can control the other, or (ii) a third controls or can control both.

(d) *Day* means a calendar day.

(e) *Department or DOT* means the Department of Transportation or an element of the Department as indicated by the context.

(f) *DOT Financial Assistance* means any grant, loan, cooperative agreement, contract, or any other arrangement between DOT and a recipient by which the Department provides or otherwise makes available assistance in the form of:

(1) Funds;

(2) Services of federal personnel;

(3) Real or personal property or any interest in or use of such property including:

(i) Transfers or leases of such property for less than fair market value or for reduced consideration; or

(ii) Proceeds from a subsequent transfer or lease of such property if the federal share or its market value is not returned to the federal government; or

(4) Loan Guarantees.

(g) *DOT Unified List* means a list compiled, maintained, and distributed by the Assistant Secretary for Administration in accordance with Subpart E of this part.

(h) *Initiating Official* means an employee designated by an administrator.

(i) *Notice* means notification in writing and sent by registered or certified mail, return receipt requested, to the last known address of the addressee.

(j) *Operating Administrations* include:

(1) U.S. Coast Guard.

(2) Federal Aviation Administration.

(3) Federal Highway Administration.

(4) Federal Railroad Administration.

(5) National Highway Traffic Safety Administration.

(6) Urban Mass Transportation Administration.

(7) St. Lawrence Seaway Development Corporation.

(8) Maritime Administration.

(9) Research and Special Programs Administration.

(10) The Office of the Secretary.

(k) *Participant* means a person or an officer or employee of a person who directly or indirectly participates, may participate, or has participated in DOT financial assistance programs through an agreement

of that person with a recipient or contractor of any tier. The term includes, but is not limited to, contractors, suppliers, fee appraisers, inspectors, real estate agents and brokers, consultants, architects, engineers, and attorneys.

(*l*) *Person* means an individual, corporation, partnership, unincorporated association, or other public or private entity.

(m) *Recipient* means any state, territory, possession, the District of Columbia, or the Commonwealth of Puerto Rico, or any political subdivision or instrumentality thereof; any public or private agency, institution, organization, entity, or individual, in any state, territory, possession, the District of Columbia, or the Commonwealth of Puerto Rico, to whom DOT financial assistance is extended, directly or through another recipient, for any program, including any successor, assignee, or transferee thereof.

## § 29.15 Hearing Officer.

Judges of the DOT Board of Contract Appeals, augmented by administrative law judges as necessary, are designated as hearing officers for purposes of this part.

## § 29.17 Initiation of measures.

(a) Anyone may contact the appropriate operating administration concerning the existence of a cause under Subpart B or C. An initiating official shall review the matter and may also refer the matter to the DOT Inspector General for further investigation. If, after his or her review, the initiating official reasonably believes that a cause exists under Subpart B or C, he or she may proceed in accordance with the appropriate subpart.

(b) Recipients shall advise the appropriate operating administration concerning the existence of a cause under Subpart B or C. Failure to do so may result in loss or impairment of DOT financial assistance.

### Subpart B—Suspension

## § 29.21 Initiation of suspension.

The initiating official may suspend any participant or affiliate pursuant to this subpart after coordination with the appropriate DOT legal office.

## § 29.23 Ground for suspension.

(a) The initiating official may suspend any participant or affiliate upon adequate evidence for any of the following causes:

(1) Commission of fraud or any criminal offense as an incident to obtaining, seeking to obtain, or performing government business or a public contract;

(2) Commission of any criminal offense indicating a lack of business integrity or business honesty that seriously and directly affects the question of present responsibility including, but not limited to, embezzlement, theft, forgery, bribery, falsification or destruction of records, false statement, fraud, receiving stolen property, violation of the Organized Crime Control Act of 1970, or violation of federal or state antitrust statutes arising out of submission of bids or proposals;

(3) Violation of any agreement for voluntary exclusion or any settlement made under this part; or

(4) Commission or omission of an act of such serious or compelling nature that the act indicates a serious lack of business integrity or honesty. Such commissions or omissions include, but are not limited to:

(i) The violation of any applicable law, regulation, or obligation relating to the performance of obligations incurred pursuant to an agreement with a recipient under a DOT financial assistance program; or

(ii) Making, or procuring to be made, any false statement or using deceit for the purpose of influencing in any way any action of the government.

(b) An outstanding indictment or information is adequate evidence of suspected criminal conduct and may be the basis for the imposition of a suspension.

## § 29.25 Suspension of affiliates.

(a) *General.* Suspension may include any affiliate of a participant. A determination to include an affiliate in a particular suspension must be made on a case-by-case basis. Among the factors to be considered in making this determination are the affiliate's knowledge of or participation in the

conduct which is the basis for the suspension.

(b) *Notice and procedure.* Where an affiliate is suspended, the affiliate shall be afforded the rights pertaining to notice and hearing provided in this subpart. In addition, when notice of suspension is given under § 29.31 to two or more persons who are affiliates of one another, each affiliate shall be provided the notice given to any other affiliate.

§ 29.27  **Period of Suspension.**

(a) *Temporary period.* A suspension shall be for a temporary period pending the completion of any investigation or any administrative or judicial proceedings as may ensue.

(b) *Time limitation on decision to suspend.* In any case involving a suspected violation of federal or state law where prosecutive action has not been initiated within twelve months from the date of the notice of suspension, the suspension shall be terminated unless the prosecuting official requests an extension of the suspension. Notice of the proposed termination of the suspension shall be given to the prosecuting official not less than thirty days prior to the expiration of the twelve-month period. In no event shall a suspension exceed eighteen months unless prosecutive action has been initiated within that period.

(c) *Waiver of time limitation.* The time limitation for suspension contained in this section may be waived by the affected party.

§ 29.29  **Items to be considered.**

Suspension is a drastic action and, as such, shall not be based on an unsupported accusation. In each case the decision of the initiating official to suspend shall be discretionary and shall be in the public interest, including the interest in doing business with participants who are presently responsible and the interest in preserving adequate competition.

§ 29.31  **Notice of suspension.**

Immediately after the suspension decision, the suspended person shall be furnished notice of the suspension by the initiating official. The notice shall include the following information:

(a) The specific acts or omissions on which the suspension is based. These may be described in general terms without disclosing the government's evidence, if greater specificity would: (1) interfere with enforcement proceedings; (2) deprive a person of a right to a fair trial or an impartial adjudication; (3) constitute an unwarranted invasion of personal privacy; (4) disclose the identity of or information furnished solely by a confidential source; (5) disclose investigative techniques and procedures; or (6) endanger the life or physical safety of law enforcement personnel.

(b) The provisions of §§ 29.27 and 29.33 regarding period of suspension and right to a hearing; and

(c) A statement that the participant may be represented by counsel, if desired.

§ 29.33  **Hearing.**

(a) *Request for hearing.* Upon written request, a suspended person is entitled to a hearing, on the suspension, before a hearing officer, as provided under subsection (b) of this section. A suspended person is entitled to a hearing within 30 days of receipt of the written request by DOT. The request may be made at any time during the period of suspension. The location of the hearing shall be determined by the hearing officer, in consideration of the convenience of the parties and the public interest. The hearing officer shall conduct proceedings and issue a decision under this section in an expeditious manner.

(b) *Hearing procedures.* (1) Where a suspension is based solely upon an indictment or information, the suspended person shall be limited to an opportunity to submit documentary evidence and written briefs, except that, where good cause is shown as to why an oral hearing should be held, the hearing officer shall grant a request for such a hearing.

(2) When an official with appropriate authority in the Department of Justice, the DOT Office of Inspector General, the Federal Bureau of Investigation, or other in-

vestigative or law enforcement agency of the federal or a state government establishes, by affidavit or sworn testimony, that disclosure of evidence which is the basis for a suspension would result in significant harm to other litigation or proceedings or to an investigation of allegations which, if proven, would constitute a violation of a criminal statute, the evidence may be presented to the hearing officer *in camera*. In such circumstances, the hearing officer shall determine whether any disclosure to the suspended person would be in the public interest and whether an opportunity to respond may be granted to the suspended person. The Department shall retain the right to withdraw such evidence from the record after the hearing officer's *in camera* determination in order to avoid disclosure to the suspended person.

(3) All witnesses shall testify under oath or affirmation. Department witnesses, if any, shall be called first and may be cross-examined by the suspended person. The person's witnesses may also be cross-examined by any party.

(4) A record shall be made of the proceeding. A transcription of the record shall be made available to a party at the expense of the requesting party.

(5) Where appropriate, and if the parties agree, a suspension hearing may be consolidated with a debarment hearing involving the same issues.

(6) The hearing officer shall sustain the suspension if he or she finds: (i) that there is adequate evidence of a cause listed in § 29.23 and (ii) that the suspension complies with § 29.27. The hearing officer shall provide notice of his or her determination to all parties.

§ 29.35   Review by Administrator.

Within fifteen days after receipt of the notice of the determination under § 29.-33(b)(6), the suspended person may file a request for review by the administrator. If the administrator, within his or her discretion, denies the request for review, the determination of the hearing officer shall be final. Where a review is granted, the determination by the administrator shall be final. The administrator's determination shall be made within sixty days after he or she receives the request for review. The administrator's determination shall recite the grounds upon which it is made. Notice of the decision shall be sent to all parties.

### Subpart C—Debarment

§ 29.41   Grounds for debarment.

Debarment may be imposed on any participant or affiliate for any of the following causes:

(a) Conviction for any cause which is a ground for suspension as set forth in § 29.23(a)(1) or § 29.23(a)(2);

(b) For any cause which is a ground for suspension as set forth in § 29.23(a)(3) or § 29.23(a)(4);

(c) Violation of a law or regulation relating to personal or organizational conflicts of interest as an incident to obtaining, attempting to obtain, or in the performance of a contract under a DOT financial assistance program;

(d) A willful or serious failure to perform or a record of unsatisfactory performance, in accordance with the terms of one or more agreements with a recipient of DOT financial assistance, provided that such failure or unsatisfactory performance has occurred within a reasonable period of time preceding the determination to debar;

(e) Violation of any contractual provision against receipt of contingent fees;

(f) Entering into an agreement with a person named on the DOT Unified List so as to cause the listed person to become, directly or indirectly, a participant in a DOT financial assistance program where it is known, or should have been known, that the person was on the list; or

(g) Disqualification from participation in direct or indirect contracting by any federal agency.

§ 29.43   Debarment of affiliates.

(a) *General.* Debarment may include any affiliate of a participant. A determination to include an affiliate in a particular debarment shall be made on a case-by-case

basis. Among the factors to be considered in making this determination are the affiliate's knowledge of or participation in the conduct which is the basis for the debarment.

(b) *Notice and procedure.* Where debarment of an affiliate is proposed, the affiliate shall be afforded the rights pertaining to notice and hearing provided in this subpart. In addition, when notice of proposed debarment is given under § 29.-49(a) to two or more persons who are affiliates of one another, each affiliate shall be provided the notice given to any other affiliate.

### § 29.45 Decision to debar.

(a) *Whether to debar.* An initiating official may propose the debarment of a participant or affiliate for any cause set forth in § 29.41 after coordination with the appropriate DOT legal office. However, the existence of any of these causes does not necessarily require that a party be excluded from DOT financial assistance programs. In each case, even if the offense or violation is of a criminal, fraudulent, or other serious nature, the proposal to debar shall be discretionary and shall be in the public interest, including the interest in doing business with participants who are presently responsible and the interest in preserving adequate competition.

(b) *Seriousness of the cause for debarment.* Among the factors to be considered in determining the seriousness of an offense or the failure or inadequacy of performance are whether the cause for debarment is based on a criminal conviction and whether the acts or omissions to act were willful. For purposes of this part, willfulness includes conduct that the person knew was in violation of applicable rules, statutes, regulations, or contract provisions.